Clifford Eugene **DAVIS, Jr.**, a minor, by his father and next friend Clifford Eugene Davis, Sr., et al.

v.

**EAST BATON ROUGE PARISH SCHOOL BOARD et al.**

Civ. A. No. 1662.

United States District Court
E. D. Louisiana,
Baton Rouge Division.

May 8, 1967.

See also D.C., 219 F.Supp. 876.

A. P. Tureaud, New Orleans, La., and Johnnie A. Jones, Baton Rouge, La., for plaintiff.

Sargent Pitcher, Dist. Atty., Parish of East Baton Rouge, La., John F. Ward, Jr., Asst. Dist. Atty., Parish of East Baton Rouge, La., Jack P. F. Gremillion, Atty. Gen., State of La., Baton Rouge, La., for defendants.

WEST, District Judge.

Once again this case concerning the desegregation of the public schools in the Parish of East Baton Rouge, Louisiana, is before the Court. On December 29, 1966, the United States Fifth Circuit Court of Appeals, by a two to one decision, handed down a most unusual decision—unusual because of its glaring inconsistencies, ambiguity, and sheer unconstitutionality. I refer to the case of United States v. Jefferson County Board of Education et al., 372 F.2d 836, with which six other cases were consolidated for hearing, and hereinafter referred to as the Jefferson case. The East Baton Rouge Parish School case was not involved in that decision. But by some stroke of magic, with no motion ever having been filed for consolidation, the Baton Rouge case suddenly appeared consolidated with the other seven cases when the matter came up for "rehearing" before the Court setting en banc. The en banc Court, by an eight to four decision, for all practical purposes upheld the original opinion, 380 F.2d 385. The dissenting opinions filed by Judges Gewin, Bell and Coleman clearly and meticulously point out the sheer absurdity and absolute unconstitutionality of the majority opinion. The majority opinion held that "The clock has ticked the last tick for tokenism and delay in the name of 'deliberate speed'." But what it fails to state is that the same clock by which that Court is apparently working may well have "ticked the last tick" for true constitutional government in these United States. As Judge Gewin so aptly stated in his dissent, the opinion of the majority "has no substantial legal ancestors." There can, of course, be no

such thing as true constitutional government in the United States if the Court is legally permitted, as that Court has done, to declare that the Constitution means one thing in seventeen states, and something else in the remaining thirty-three states. There are judges who have publicly stated their belief that the United States Supreme Court should, in fact, function as a "super legislative body" rather than as a court in the usual sense of the word. The majority opinion in the Jefferson case strongly indicates that there are those who believe that this should also be the function of the Courts of Appeals. When, in his dissent, Judge Gewin states that this decision "bends and twists the Constitution" he exercises remarkable restraint. The fact is that the decision not only "bends and twists" the Constitution, it breaks and destroys it. It also defies and ignores the very Acts of Congress which it professes to be interpreting and enforcing. It completely ignores the constitutional requirement of separation of powers between the Executive, Legislative, and Judicial branches of the Government when it undertakes to legislate as it has done in this case. And when it decrees that school boards (in the Southern and Border states only) must take affirmative action to *"integrate* students, faculties, facilities and activities" it either attempts to repeal, or it ignores completely the provisions of the Civil Rights Act of 1964 which specifically state:

" 'Desegregation' means the assignment of students to public schools and within such schools without regard to their race, color, religion, or national origin, but 'desegregation' shall not mean the assignment of students to public schools in order to overcome racial imbalance." 42 U.S.C.A. § 2000c(b).

" * * * provided that nothing herein shall empower any official or court of the United States to issue any order seeking to achieve a racial balance in any school by requiring the transportation of pupils or students from one school to another or one school district to another in order to achieve such racial balance, or otherwise enlarge the existing power of the court to insure compliance with constitutional standards." 42 U.S.C.A. § 2000c–6(a) (2).

The Court neatly sidesteps these specific impediments to the legality of its decision by simply stating:

" * * * the equitable powers of the courts exist independently of the Civil Rights Act of 1964."

The utter ridiculousness of the opinion as it attempts to distinguish between the law as it applies to de jure segregation and the law as it applies to de facto segregation is readily apparent. The Court concludes that its opinion states the law only as it applies to the seventeen Southern and Border states—the states in which it says segregation is of the "de jure" type rather than of the "de facto" kind. It states that its opinion does not attempt to state the law as to the remaining thirty-three states where, it says, segregation is of the "de facto" type. It then proceeds to attempt to legislate an end to *all* segregation in the schools of these seventeen states, without regard to whether or not the segregation remaining after the implementation of desegregation orders is really de facto segregation. It even goes to the extent of ordering the local school boards to close certain schools under certain conditions, and instructing them how to choose locations for new schools. It is hard to reconcile their assertion that their opinion only applies to certain states, and not to others, when they say in another part of their opinion that "What [was true] of an earlier Athens and an earlier Rome is true today: In Georgia, for example, there should not be one law for Athens and another law for Rome." Should there be one law for Louisiana and another for New York, and one law for Mississippi and another for Illinois?

But assuming by the use of legal doubletalk we could somehow conclude that under the law as it presently stands

it is only de jure segregation that is unconstitutional, the question arises as to what is the status of the law in these seventeen states with regard to areas where segregation is maintained by *choice* on a de facto basis? Is the majority of the Court so oblivious of the facts as to believe that de facto segregation does not exist in areas of the South as well as in the North? Indeed, are they so oblivious of the facts as to believe that de facto segregation, that is, segregation *by choice*, does not exist in this very City of Baton Rouge? The majority opinion states that "The only school desegregation plan that meets constitutional standards is one that works." Suppose the school desegregation plan already in operation in a given area *is* working to the extent that all students do, in fact, have a free and unfettered choice of the school which he will attend, and suppose the situation arises where it cannot be fairly said that there any longer exists "de jure" segregation but that segregation *does* continue to exist on a neighborhood, de facto, free choice basis. In such an event, does such an area then join the Northern states against whom this decision is not intended to operate, or does the operation of the statute then become enlarged to cover such de facto segregation simply because the area involved is located in one of the seventeen Southern or Border states? By what criteria is it to be decided when de jure segregation ends and de facto segregation begins? Are these questions to be determined by the method used by the Department of Health, Education and Welfare in applying their so-called guidelines, or will the school boards be given an evidentiary hearing in a court of law to determine such an issue? It must be remembered that the school boards were not given such an evidentiary hearing in the present case on the question of whether or not the H.E.W. guidelines should be applied to the schools involved. That issue was never presented to the District Courts in which these cases originated, the Courts in which, according to law, litigation is supposed to originate. The

Court of Appeals, sua sponte, injected this issue into the cases for the first time while they were supposedly "on appeal" before it. In view of this procedure, it would seem logical to conclude that it is now the intention of the Court of Appeals to take over the function of the District Courts insofar as these school desegregation matters are concerned. Apparently insofar, at least, as cases involving desegregation of schools are concerned, litigation may now start at the appellate level. I respectfully express my doubt of the wisdom of this procedure and agree with Judge Gewin when he says " * * * due process and sound judicial administration require, at the very least, an evidentiary hearing * * *. It is unthinkable that matters that so vitally affect this phase of the national welfare should be decided in such summary fashion." Judge Bell put it another way in his dissent when he said that this decision of the majority amounts to an "adjudication without any semblance of due process of law. It is an unprecedented procedure and a shocking departure from even rudimentary due process."

The Jefferson decision is apparently the final step in the Fifth Circuit Court of Appeals' determination to bring about not, as the law clearly requires, an end to forced segregation in public schools, but instead a complete, forced, total integration of the races in every school. It seems to matter not that the Congress has specifically decreed otherwise, and it seems to matter not that such a result has never been required or suggested under the Constitution or laws of the United States as interpreted by the highest court of the land. As Judge Gewin says " * * * All things must yield to speed, uniformity, percentages, and proportional representation. * * * " The decree of the majority shows an obvious "determination * * * to achieve percentage enrollments which will reflect the kind of racial balance the [*court*] seeks to achieve."

■ But this racial balance was never contemplated by Congress when it passed

the Civil Rights Act of 1964. In explaining the Bill to Congress, the then Senator Humphrey said:

"The Bill does not attempt to integrate the schools * * *. The fact that there is a racial imbalance per se is not something which is unconstitutional."

But in the Jefferson case the majority of the Court said:

"* * * the 'personal and present' right of the individual plaintiffs must yield to the overriding right of Negroes as a class to a completely integrated public education."

This statement is difficult to understand in view of the fact that prior to the Jefferson case, this same Court, on at least nine different occasions, specifically approved the holding in the case of Briggs et al. v. Elliott et al., 132 F.Supp. 776 (E.D.S.C.1955) wherein it was specifically stated that:

"The Constitution, in other words, does not require integration. It merely forbids segregation."

Now, for some strange and obscure reason, without any change in the law having been made by either the Congress or the United States Supreme Court, the holding in Briggs suddenly becomes "dictum" by which the Court of Appeals says it is not bound, at least insofar as the seventeen Southern and Border states are concerned. It is apparently the law elsewhere, but not here. In explanation of this "switch" the Court said:

"However, as this Court's experience in handling school cases increased, the Court became aware of the frustrating effects of Briggs."

And then, in order to avoid the frustration involved in following the law as clearly stated by both the Congress and the Supreme Court, the majority of the Court in the en banc hearing neatly sidestepped the whole affair by simply stating, without any legal justification whatsoever, that:

"The Court holds that boards and officials administering public schools in this Circuit have the affirmative duty under the Fourteenth Amendment to bring about an integrated, unitary school system in which there are no Negro schools and no white schools—just schools. Expressions in our earlier opinion distinguishing between integration and desegregation must yield to this affirmative duty we now recognize. * * * To the extent that earlier decisions of this Court * * * conflict with this view, the decisions are overruled."

The conclusion now reached by the Court of Appeals that the statement contained in the Briggs case that "The Constitution, in other words, does not require integration. It merely forbids segregation" is merely dictum by which it is not bound is interesting indeed. I assume that if the statement in Briggs had been to the effect that the Constitution *did* require integration, it would also have been considered to be mere dictum. If so, it could, of course, have no precedential value. And if such a statement in Briggs is dictum and not binding, then of course it must necessarily follow that a similar statement of another court, such as the Fifth Circuit Court of Appeals is mere dictum and not binding upon other courts in future cases.

When judicial precedent and specific enactments of Congress can be so lightly and summarily cast aside, and when in their place can be substituted a decree whose obvious purpose, as noted by Judge Gewin in his dissent, is a "determination * * * to achieve percentage enrollment which will reflect the kind of racial balance the [*court*] seeks to achieve," I can only say that I wholeheartedly agree with Judge Hutchinson when he said in Lee v. United States of America, 322 F.2d 770 (CA 5–1963):

"* * * I emphatically condemn and reject the majority's view as simply personal decreeing and, as such, alien to this circuit and to the law generally and as completely unauthorized."

█ It is far too late for anyone to take issue with the fact that the established law of the land now requires that there be no *forced segregation* in

public schools. But it is equally well established in law that neither the Constitution nor the laws of the United States of America require forced integration of the races in public schools. The law is clear. It requires that public schools be maintained and operated, not as Negro schools and not as white schools, but as public schools. It requires nothing more nor less than that within the bounds of proper school administration all students have a free and unfettered choice of the school he wishes to attend, and that he has the right to be assigned to the school of his choice without regard to his race, color, religion, or national origin. If the plan adopted by a school system employs this criteria, and if the freely exercised choice of students or parents results in de facto segregation, that is merely an example of freedom of choice in operation. It is just as important that one's freedom to choose a school that does not happen to suit the fancy of the Court be protected and respected as it is to protect the rights of those who elect to attend the schools which the Court, in its infinite wisdom, thinks they should attend. The majority opinion handed down in this case gives one the impression that the Courts are the guardians of the educational processes employed in this country. Search as I may, I have been unable to find authority for the assumption by the Court of such a duty. The primary function of the Courts is to decide cases and controversies—not to administer the local school systems. Regardless of how "frustrated" the Court of Appeals may become as its experience in handling school cases increases, such frustration is, in my humble opinion, no justification for its taking over, "lock, stock and barrel," the operation of the public school systems. It is one thing to adjudicate disputes between litigants, and it is quite another to carry the modern day theory of judicial activism to the extent demonstrated in this case.

No one will dispute the fact that, in the past, Negro children have been short changed when it comes to educational opportunity, especially in the South. Congress has attempted to alleviate this situation by the passage of various pieces of Civil Rights legislation. It is up to the Courts to interpret those Acts, along with the Constitution of the United States, and demand compliance therewith. If the legislation passed by Congress is inadequate then it is, of course, the prerogative of Congress to change it. If the Constitution is inadequate, then it should be amended by proper constitutional process. But in neither case should this Court, or any other Court, take it unto themselves to usurp the powers and functions of Congress and to change the law to make it conform to the way *they* think the law ought to be. That is what has happened in this case. If the law providing for an end to forced segregation in public schools does not work in such a fashion as to give every child, white and negro alike, an honest, opportunity to freely choose the school he wishes to attend, then the law should be changed by proper legislative procedures. It should not be changed by the bending and twisting process indulged in by the Court in this case.

When, as stated by Judge Gewin, the Constitution and laws of the United States can be so easily "bent and twisted," it is difficult to disagree with Judge Bell when he says that the type of standards set by the Court in this case "places school systems under men and not laws."

■ But since the District Courts in the Fifth Circuit seem now to have been completely stripped of all discretion insofar at least as the cases directly involved in the Jefferson decision are concerned, and since, even though never consolidated by proper legal procedure the East Baton Rouge Parish school case has somehow been included within the ambit of that decision, this Court now has no alternative but to comply with the mandate issued therein. That mandate says:

"The Court reaffirms the reversal of the judgments below and the remand

of each case *for entry of the decree attached to this opinion."*

I agree with Judge Gewin when he says the effect of this mandate is that:

"The effectiveness of the District Courts has been seriously impaired * * *. Now his (the District Judge's) only functions are to order the enforcement of the detailed, uniform stereotyped formal decree * * * and to receive periodic reports much in the same fashion as reports are received by an ordinary clerk in a large business establishment."

So, functioning in that capacity, I herewith enter the "detailed, uniform, stereotyped formal decree" that is attached to the majority opinion.

I concur with Judge Bell when he notes that because of the detailed character of this decree formulated by the Court of Appeals it is doubtful "that sufficient latitude is left to the District Courts to adjust such practical difficulties as may arise under the details of the decree." I can only assume that the Court of Appeals, whose decree I enter this day, has also assumed the duty of interpreting, applying, and enforcing compliance therewith as the need arises. While the decree does not specifically so state, I would nevertheless assume that the Court of Appeals does intend to retain jurisdiction over this matter for the issuance of such future orders and decrees as it may in its judgment deem necessary and advisable.

Decree will be entered accordingly.

For the written reasons this day assigned, and in compliance with the mandate of the United States Fifth Circuit Court of Appeals, the following decree is hereby entered and issued:

### CORRECTED DECREE.

It is ORDERED, ADJUDGED and DECREED that the defendants, their agents, officers, employees and successors and all those in active concert and participation with them, be and they are permanently enjoined from discriminating on the basis of race or color in the operation of the school system. As set out more particularly in the body of the decree, they shall take affirmative action to disestablish all school segregation and to eliminate the effects of the dual school system:

### I.

### SPEED OF DESEGREGATION

Commencing with the 1967–68 school year, in accordance with this decree, all grades, including kindergarten grades, shall be desegregated and pupils assigned to schools in these grades without regard to race or color.

### II.

### EXERCISE OF CHOICE

The following provisions shall apply to all grades:

(a) *Who May Exercise Choice.* A choice of schools may be exercised by a parent or other adult person serving as the student's parent. A student may exercise his own choice if he (1) is exercising a choice for the ninth or a higher grade, or (2) has reached the age of fifteen at the time of the exercise of choice. Such a choice by a student is controlling unless a different choice is exercised for him by his parent or other adult person serving as his parent during the choice period or at such later time as the student exercises a choice. Each reference in this decree to a student's exercising a choice means the exercise of the choice, as appropriate, by a parent or such other adult, or by the student himself.

(b) *Annual Exercise of Choice.* All students, both white and Negro, shall be required to exercise a free choice of schools annually.

(c) *Choice Period.* The period for exercising choice shall commence May 1, 1967 and end June 1, 1967, and in subsequent years shall commence March 1 and end March 31 preceding the school

year for which the choice is to be exercised. No student or prospective student who exercises his choice within the choice period shall be given any preference because of the time within the period when such choice was exercised.

(d) *Mandatory Exercise of Choice.* A failure to exercise a choice within the choice period shall not preclude any student from exercising a choice at any time before he commences school for the year with respect to which the choice applies, but such choice may be subordinated to the choices of students who exercised choice before the expiration of the choice period. Any student who has not exercised his choice of school within a week after school opens shall be assigned to the school nearest his home where space is available under standards for determining available space which shall be applied uniformly throughout the system.

(e) *Public Notice.* On or within a week before the date the choice period opens, the defendants shall arrange for the conspicuous publication of a notice describing the provisions of this decree in the newspaper most generally circulated in the community. The text of the notice shall be substantially similar to the text of the explanatory letter sent home to parents. Publication as a legal notice will not be sufficient. Copies of this notice must also be given at that time to all radio and television stations located in the community. Copies of this decree shall be posted in each school in the school system and at the Office of the Superintendent of Education.

(f) *Mailing of Explanatory Letters and Choice Forms.* On the first day of the choice period there shall be distributed by first-class mail an explanatory letter and a choice form to the parent (or other adult person acting as parent, if known to the defendants) of each student, together with a return envelope addressed to the Superintendent. Should the defendants satisfactorily demonstrate to the court that they are unable to comply with the requirement of distributing the explanatory letter and choice form by first-class mail, they shall propose an alternative method which will maximize individual notice, i. e., personal notice to parents by delivery to the pupil with adequate procedures to insure the delivery of the notice. The text for the explanatory letter and choice form shall essentially conform to the sample letter and choice form appended to this decree.

(g) *Extra Copies of the Explanatory Letter and Choice Form.* Extra copies of the explanatory letter and choice form shall be freely available to parents, students, prospective students, and the general public at each school in the system and at the Office of the Superintendent of Education during the times of the year when such schools are usually open.

(h) *Content of Choice Form.* Each choice form shall set forth the name and location and the grades offered at each school and may require of the person exercising the choice the name, address, age of student, school and grade currently or most recently attended by the student, the school chosen, the signature of *one* parent or other adult person serving as parent, or where appropriate the signature of the student, and the identity of the person signing. No statement of reasons for a particular choice, or any other information, or any witness or other authentication, may be required or requested, without approval of the court.

(i) *Return of Choice Form.* At the option of the person completing the choice form, the choice may be returned by mail, in person, or by messenger to any school in the school system or to the office of the Superintendent.

(j) *Choices not on Official Form.* The exercise of choice may also be made by the submission in like manner of any other writing which contains information sufficient to identify the student and indicates that he has made a choice of school.

(k) *Choice Forms Binding.* When a choice form has once been submitted and the choice period has expired, the choice is binding for the entire school year and

may not be changed except in cases of parents making different choices from their children under the conditions set forth in paragraph II(a) of this decree and in exceptional cases where, absent the consideration of race, a change is educationally called for or where compelling hardship is shown by the student. A change in family residence from one neighborhood to another shall be considered an exceptional case for purposes of this paragraph.

(l) *Preference in Assignment.* In assigning students to schools, no preferences shall be given to any student for prior attendance at a school and, except with the approval of court in extraordinary circumstances, no choice shall be denied for any reason other than over-crowding. In case of over-crowding at any school, preference shall be given on the basis of the proximity of the school to the homes of the students choosing it, without regard to race or color. Standards for determining over-crowding shall be applied uniformly throughout the system.

(m) *Second Choice where First Choice is Denied.* Any student whose choice is denied must be promptly notified in writing and given his choice of any school in the school system serving his grade level where space is available. The student shall have seven days from the receipt of notice of a denial of first choice in which to exercise a second choice.

(n) *Transportation.* Where transportation is generally provided, buses must be routed to the maximum extent feasible in light of the geographic distribution of students, so as to serve each student choosing any school in the system. Every student choosing either the formerly white or the formerly Negro school nearest his residence must be transported to the school to which he is assigned under those provisions, whether or not it is his first choice, if that school is sufficiently distant from his home to make

him eligible for transportation under generally applicable transportation rules.

(o) *Officials not to Influence Choice.* At no time shall any official, teacher, or employee of the school system influence any parent, or other adult person serving as a parent, or any student, in the exercise of a choice or favor or penalize any person because of a choice made. If the defendant school board employs professional guidance counselors, such persons shall base their guidance and counselling on the individual student's particular personal, academic, and vocational needs. Such guidance and counselling by teachers as well as professional guidance counsellors shall be available to all students without regard to race or color.

(p) *Protection of Persons Exercising Choice.* Within their authority school officials are responsible for the protection of persons exercising rights under or otherwise affected by this decree. They shall, without delay, take appropriate action with regard to any student or staff member who interferes with the successful operation of the plan. Such interference shall include harassment, intimidation, threats, hostile words or acts, and similar behavior. The school board shall not publish, allow, or cause to be published, the names or addresses of pupils exercising rights or otherwise affected by this decree. If officials of the school system are not able to provide sufficient protection, they shall seek whatever assistance is necessary from other appropriate officials.

### III.

### PROSPECTIVE STUDENTS

Each prospective new student shall be required to exercise a choice of schools before or at the time of enrollment. All such students known to defendants shall be furnished a copy of the prescribed letter to parents, and choice form, by mail or in person, on the date the choice period opens or as soon thereafter as the school system learns that he plans to

enroll. Where there is no pre-registration procedure for newly entering students, copies of the choice forms shall be available at the Office of the Superintendent and at each school during the time the school is usually open.

## IV.

### TRANSFERS

(a) *Transfers for Students.* Any student shall have the right at the beginning of a new term, to transfer to any school from which he was excluded or would otherwise be excluded on account of his race or color.

(b) *Transfers for Special Needs.* Any student who requires a course of study not offered at the school to which he has been assigned may be permitted, upon his written application, at the beginning of any school term or semester, to transfer to another school which offers courses for his special needs.

(c) *Transfers to Special Classes or Schools.* If the defendants operate and maintain special classes or schools for physically handicapped, mentally retarded, or gifted children, the defendants may assign children to such schools or classes on a basis related to the function of the special class or school that is other than freedom of choice. In no event shall such assignments be made on the basis of race or color or in a manner which tends to perpetuate a dual school system based on race or color.

## V.

### SERVICES, FACILITIES, ACTIVITIES AND PROGRAMS

No student shall be segregated or discriminated against on account of race or color in any service, facility, activity, or program (including transportation, athletics, or other extracurricular activity) that may be conducted or sponsored by the school in which he is enrolled. A student attending school for the first time on a desegregated basis may not be subject to any disqualification or waiting period for participation in activities and programs, including athletics, which might otherwise apply because he is a transfer or newly assigned student except that such transferees shall be subject to longstanding, non-racially based rules of city, county, or state athletic associations dealing with the eligibility of transfer students for athletic contests. All school use or school sponsored use of athletic fields, meeting rooms, and all other school related services, facilities, activities, and programs such as commencement exercises and parent-teacher meetings which are open to persons other than enrolled students, shall be open to all persons without regard to race or color. All special educational programs conducted by the defendants shall be conducted without regard to race or color.

## VI.

### SCHOOL EQUALIZATION

(a) *Inferior Schools.* In schools heretofore maintained for Negro students, the defendants shall take prompt steps necessary to provide physical facilities, equipment, courses of instruction, and instructional materials of quality equal to that provided in schools previously maintained for white students. Conditions of overcrowding, as determined by pupil-teacher ratios and pupil-classroom ratios shall, to the extent feasible, be distributed evenly between schools formerly maintained for Negro students and those formerly maintained for white students. If for any reason it is not feasible to improve sufficiently any school formerly maintained for Negro students, where such improvement would otherwise be required by this paragraph, such school shall be closed as soon as possible, and students enrolled in the school shall be reassigned on the basis of freedom of choice. By October of each year, defendants shall report to the Clerk of the Court pupil-teacher ratios,

pupil-classroom ratios, and per-pupil expenditures both as to operating and capital improvement costs, and shall outline the steps to be taken and the time within which they shall accomplish the equalization of such schools.

(b) *Remedial Programs.* The defendants shall provide remedial education programs which permit students attending or who have previously attended segregated schools to overcome past inadequacies in their education.

## VII.

## NEW CONSTRUCTION

The defendants, to the extent consistent with the proper operation of the school system as a whole, shall locate any new school and substantially expand any existing schools with the objective of eradicating the vestiges of the dual system.

## VIII.

## FACULTY AND STAFF

(a) *Faculty Employment.* Race or color shall not be a factor in the hiring, assignment, reassignment, promotion, demotion, or dismissal of teachers and other professional staff members, including student teachers, except that race may be taken into account for the purpose of counteracting or correcting the effect of the segregated assignment of faculty and staff in the dual system. Teachers, principals, and staff members shall be assigned to schools so that the faculty and staff is not composed exclusively of members of one race. Wherever possible, teachers shall be assigned so that more than one teacher of the minority race (white or Negro) shall be on a desegregated faculty. Defendants shall take positive and affirmative steps to accomplish the desegregation of their school faculties and to achieve substantial desegregation of faculties in as many of the schools as possible for the 1967–68 school year notwithstanding that teacher contracts for the 1967–68 or 1968–69

school years may have already been signed and approved. The tenure of teachers in the system shall not be used as an excuse for failure to comply with this provision. The defendants shall establish as an objective that the pattern of teacher assignment to any particular school not be identifiable as tailored for a heavy concentration of either Negro or white pupils in the school.

(b) *Dismissals.* Teachers and other professional staff members may not be discriminatorily assigned, dismissed, demoted, or passed over for retention, promotion, or rehiring, on the ground of race or color. In any instance where one or more teachers or other professional staff members are to be displaced as a result of desegregation, no staff vacancy in the school system shall be filled through recruitment from outside the system unless no such displaced staff member is qualified to fill the vacancy. If, as a result of desegregation, there is to be a reduction in the total professional staff of the school system, the qualifications of all staff members in the system shall be evaluated in selecting the staff member to be released without consideration of race or color. A report containing any such proposed dismissals, and the reasons therefor, shall be filed with the Clerk of the Court, serving copies upon opposing counsel, within five (5) days after such dismissal, demotion, etc., as proposed.

(c) *Past Assignments.* The defendants shall take steps to assign and reassign teachers and other professional staff members to eliminate the effects of the dual school system.

## IX.

## REPORTS TO THE COURT

(1) *Report on Choice Period.* The defendants shall serve upon the opposing parties and file with the Clerk of the Court on or before April 15, 1967, and on or before June 15, 1967, and in each subsequent year on or before June 1, a report tabulating by race the number of choice applications and transfer applications re-

ceived for enrollment in each grade in each school in the system, and the number of choices and transfers granted and the number of denials in each grade of each school. The report shall also state any reasons relied upon in denying choice and shall tabulate, by school and by race of student, the number of choices and transfers denied for each such reason.

In addition, the report shall show the percentage of pupils actually transferred or assigned from segregated grades or to schools attended predominantly by pupils of a race other than the race of the applicant, for attendance during the 1966–67 school year, with comparable data for the 1965–66 school year. Such additional information shall be included in the report served upon opposing counsel and filed with the Clerk of the Court.

(2) *Report After School Opening.* The defendants shall, in addition to reports elsewhere described, serve upon opposing counsel and file with the Clerk of the Court within 15 days after the opening of schools for the fall semester of each year, a report setting forth the following information:

(i) The name, address, grade, school of choice and school of present attendance of each student who has withdrawn or requested withdrawal of his choice of school or who has transferred after the start of the school year, together with a description of any action taken by the defendants on his request and the reasons therefor.

(ii) The number of faculty vacancies, by school, that have occurred or been filled by the defendants since the order of this Court or the latest report submitted pursuant to this sub-paragraph. This report shall state the race of the teacher employed to fill each such vacancy and indicate whether such teacher is newly employed or was transferred from within the system. The tabulation of the number of transfers within the system shall indicate the schools from which and to which

the transfers were made. The report shall also set forth the number of faculty members of each race assigned to each school for the current year.

(iii) The number of students by race, in each grade of each school.

EXPLANATORY LETTER

(School System Name and Office Address)

(Date Sent)

Dear Parent:

All grades in our school system will be desegregated next year. Any student who will be entering one of these grades next year may choose to attend any school in our system, regardless of whether that school was formerly all-white or all Negro. It does not matter which school your child is attending this year. You and your child may select any school you wish.

Every student, white and Negro, must make a choice of schools. If a child is entering the ninth or higher grade, or if the child is fifteen years old or older, he may make the choice himself. Otherwise a parent or other adult serving as parent must sign the choice form. A child enrolling in the school system for the first time must make a choice of schools before or at the time of his enrollment.

The form on which the choice should be made is attached to this letter. It should be completed and returned by June 1, 1967. You may mail it in the enclosed envelope, or deliver it by messenger or by hand to any school principal or to the Office of the Superintendent at any time between May 1 and June 1. No one may require you to return your choice form before June 1 and no preference is given for returning the choice form early.

No principal, teacher or other school official is permitted to influence anyone in making a choice or to require early return of the choice form. No one is permitted to favor or penalize any student or other person because of a choice

made. A choice once made cannot be changed except for serious hardship.

No child will be denied his choice unless for reasons of overcrowding at the school chosen, in which case children living nearest the school will have preference.

Transportation will be provided, if reasonably possible, no matter what school is chosen. [Delete if the school system does not provide transportation.]

Your School Board and the school staff will do everything we can to see to it that the rights of all students are protected and that desegregation of our schools is carried out successfully.

Sincerely yours,

Superintendent.

## CHOICE FORM

This form is provided for you to choose a school for your child to attend next year. You have 30 days to make your choice. It does not matter which school your child attended last year, and does not matter whether the school you choose was formerly a white or Negro school. This form must be mailed or brought to the principal of any school in the system or to the office of the Superintendent, [address], by June 1, 1967. A choice is required for each child.

Name of child ............................................
(Last)          (First)          (Middle)

Address ....................................................

Name of Parent or other adult
serving as parent ........................................

If child is entering first grade, date of birth:

.............................................
(Month)          (Day)          (Year)

Grade child is entering ..................................

School attended last year ................................

Choose one of the following schools by marking an X beside the name.

| Name of School | Grade | Location |
|---|---|---|
| .................... | .................... | .................... |
| .................... | .................... | .................... |
| .................... | .................... | .................... |
| .................... | .................... | .................... |

Signature ....................

Date      ....................

...............................................................
...............................................................
To be filled in by Superintendent:
School Assigned ..............................