**Clifford E. DAVIS, Jr., et al.**

v.

**EAST BATON ROUGE PARISH SCHOOL BOARD et al.**

**Civ. A. No. 1662–A.**

United States District Court,
M. D. Louisiana.

Sept. 11, 1980.

Robert C. Williams, Baton Rouge, La., for plaintiffs–intervenors Bryant and Potter.

Franz R. Marshall, Sandra L. Beber, U. S. Dept. of Justice, Washington, D. C., C. Michael Hill, Asst. U. S. Atty., Baton Rouge, La., for plaintiff–intervenor United States.

John F. Ward, Jr., Baton Rouge, La., for defendants.

## MEMORANDUM OPINION

JOHN V. PARKER, Chief Judge.

This school desegregation case, like many other such cases, has bounced back and forth with regularity from district to appellate to district court levels since its original filing in 1956. Its twists and turns are well documented in the reports of judicial decisions and they will not be detailed here.[1]

The facts necessary to an understanding of the present posture of the case are: In 1960 the first order issued enjoining the school board from continuing to operate a racially segregated school system. In 1963, in response to a district court order, the school board implemented a "freedom of choice" desegregation plan which was eventually disapproved by the Court of Appeals. In 1970 the board submitted and the district court approved a "neighborhood zoning plan" for further desegregation of the school system. No appeal was taken and the board continues to operate under that 1970 court order. In 1974 plaintiffs–intervenors filed a motion for further relief, alleging that the neighborhood zoning plan had failed to achieve complete and effective desegregation of the entire system, as the law requires. The district court denied further relief and dismissed the suit, and the matter was again appealed to the Court of Appeals.

The matter is now before the Court on the latest remand with instructions from the Fifth Circuit. That Court reversed a district court finding of August 21, 1975, that the East Baton Rouge Parish school system is a "unitary" school system, that is, one from which all state–imposed racial segregation has been eliminated "root and branch." *Swann v. Charlotte–Mecklenburg Board of Education,* 402 U.S. 1, 14, 91 S.Ct. 1267, 1275, 28 L.Ed.2d 554 (1971). The Court of Appeals directed this Court to reconsider that determination and to recon-

---

1. The complete history of the case may be found in these reported decisions: 214 F.Supp. 624 (E.D.La.1963); 219 F.Supp. 876 (E.D.La. 1963); 287 F.2d 380 (5th Cir. 1961), writ denied, 368 U.S. 831, 82 S.Ct. 54, 7 L.Ed.2d 34 (1961); 372 F.2d 949 (5th Cir. 1967); 380 F.2d 385 (5th Cir. 1967) (en banc), writ denied, 389 U.S. 840, 88 S.Ct. 72, 19 L.Ed.2d 103 (1967); 269 F.Supp. 60 (E.D.La.1967); 398 F.Supp. 1013 (M.D.La.1975); 570 F.2d 1260 (5th Cir. 1978), cert. denied, 439 U.S. 1114, 99 S.Ct. 1016, 59 L.Ed.2d 72 (1979).

sider the motion for further relief, and the Court of Appeals spelled out in considerable detail the precise issues to be reconsidered, as well as the standards to be applied in that reconsideration.

The United States, now also an intervenor, has filed a motion for partial summary judgment under Rule 56, Fed.R.Civ.P., in which plaintiffs–intervenors join and which is the matter now pending for resolution. The United States claims that material facts, about which there is no genuine dispute, establish that it is entitled to judgment "on the issue of liability" as a matter of law. This action is presently assigned for trial beginning October 27, 1980, and the government asks that summary judgment be granted and that the trial be limited to the issue of "appropriate relief."

In support of its motion for summary judgment, the government, as it is required to do by Local Rule, has submitted a list of material facts which it claims are undisputed and has also submitted portions of the depositions of Clyde H. Lindsey, a former Superintendent of Schools, and Lorin V. Smiley, an Assistant Superintendent of Schools. The school board opposes the motion and has submitted affidavits by former Superintendent of Schools, Robert J. Aertker, and Dr. Lindsey. The school board admits that the government's list of undisputed facts "except for minor statistical errors" is correct. The matter was submitted to the Court on September 5, 1980, upon the filings and briefs of the parties. No oral argument is required.

The motion for summary judgment offered by the government presents two specific issues for resolution: (1) Does the continued existence of too many one–race schools demonstrate that the 1970 desegregation plan has not effectively desegregated the school system? (2) Does the teacher assignment plan instituted by the board under the 1970 court order have the effect of lowering the quality of education of black students by placing less experienced teachers in "black" schools?

On March 28, 1980, this Court by minute entry outlined the nature of the issues to be tried, insofar as here pertinent, as follows:

"I. STUDENT ASSIGNMENT

"A. If the evidence shows continued existence of substantially one–race schools, the school board will have the burden of proving that school assignments are genuinely non–discriminatory.

"B. The Court will scrutinize all such schools and the burden will be upon the school board to prove that their racial composition is not the result of present or past discriminatory action on the part of the board.

"C. If the evidence shows continued existence of substantially one–race schools, the Court will apply a presumption against the school board that their racial composition is the result of the school board's discriminatory actions.

\* \* \* \* \* \*

"II. TEACHER REASSIGNMENT

"A. Has the reassignment plan which was designed to remedy the disproportionate racial balance of teachers in the schools led to placement of inexperienced teachers in the 'black' schools?

"B. If the answer to 'A' above is 'yes,' has this hurt the quality of education in the 'black' schools?

"C. In the light of the dual purposes involved—desegregation must be effected and quality education must be promoted—are changes in the teacher assignment plan now required?

"D. If the answer to 'C' above is 'yes,' what are those changes and what effect will they have upon the educational system?"

*Student Assignment*

The undisputed facts which are to be measured against the above–stated standards establish the following:

During and before 1954, when the Supreme Court declared that state–imposed segregation of the races in public schools violates the Constitution, *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), state law required that the public schools in East Baton Rouge Parish

be segregated by race and they were, in fact, segregated. In 1954 there were 53 schools in the system, 31 white and 22 black.

■ At present, about 68,000 pupils attend 113 public schools in East Baton Route Parish. The racial proportion is about 60 percent white–40 percent black. At this time (the 1979–1980 school year) the East Baton Rouge Parish School Board operates 35 all–black schools[2] and 32 all–white schools. Although the government has not seen fit to establish precise numbers, it is undisputed that a majority of black students in the parish still attend all–black schools and a majority of the white students still attend all–white schools. Only 46 schools (about 40 percent of the total) have racially–mixed student bodies.[3]

Of the 22 black schools existing in 1954, the school board has closed 4, with no white children ever attending, and has continued to operate 12 with at least 95 percent black student populations. Since 1954, the school board has also constructed 14 additional black public schools, all with at least 95 percent black student populations. During that same period, the school board has closed about 7 white schools, with no black children ever having attended them, and has also constructed 17 new white public schools.

Since 1954, the school board has constructed a total of 76 new public schools (a number of old schools have also been closed, sold or converted to other uses). The board opened 73 of those 76 new schools as all

black or all white[4] (some enrollments have changed since the school opened) and has only opened one school in the last 25 years where the majority race was less than 80 percent. Of the 76 schools constructed, 14 are presently all black and 26 are presently all white. During the 16 years of active board desegregation efforts (since 1963), the school board has constructed 36 new schools, 4 of them are all black and 17 are all white.

The deposition of Dr. Smiley and the undisputed facts establish that the school board has simply constructed white schools for white students and black schools for black students without consideration of location so as to further desegregation or to forestall resegregation of the school system. Indeed, the board has, on occasion, ignored or rejected recommendations made by the Biracial Committee or the school staff that such matters be considered. Dr. Smiley's deposition also establishes that in at least two instances the board has made political, not educational, decisions to decline to close schools and these were schools closure of which "would have added substantially to the desegregation of the school system."

It is undisputed that the board has followed the practice of constructing temporary classrooms at schools which become overcrowded rather than transferring excess students to under–utilized schools. It is undisputed that this practice is educationally unsound and that most temporary classrooms have been placed at white schools.

---

**2.** For our purposes here, we consider a school to be "all black" or "all white" if 90 percent or more of the student body is of the same race.

**3.** If schools having one–race student bodies of 80 percent or more are subtracted from this number, there are only 35 racially–mixed schools. This would mean that 30 percent of the public schools are desegregated while 70 percent are still operated as one–race public institutions. The Court does not here hold that there is any specific magic number or "quota" which is necessary in order to determine that a particular school is desegregated, and the Court is fully mindful of the jurisprudence mandating that we view the system as a whole rather than individual schools, *Swann, supra; Carr v. Montgomery County Board of Educa-*

*tion*, 377 F.Supp. 1123 (M.D.Ala.1974), affirmed, 511 F.2d 1374 (5th Cir. 1975), cert. denied, 423 U.S. 986, 96 S.Ct. 394, 46 L.Ed.2d 303 (1975). It is not unreasonable to expect, however, that a school board which has been actively desegregating its system since 1963 would operate more than 35 of its 113 public schools with school populations containing at least 20 percent of the opposite race. To put it another way, one is entitled to be surprised that after 16 years of desegregation efforts by the school board, 78 (70 percent of all schools) are still at least 80 percent black or 80 percent white.

**4.** Still using the standard of 90 percent or more, one–race.

From 1965 to 1974, at least one new school was opened every year which required redrawing of school attendance zones. There were also school closings and population shifts so that in every year there have been 10 to 15 changes in school attendance zones. Dr. Smiley's deposition establishes that the board never considered making attendance zone changes for the purpose of further desegregation, despite the fact that some changes in zones were recommended to the board for that purpose and despite the undisputed fact that such changes would have resulted in additional desegregation of the system.

As noted earlier, the board does not dispute these facts. It counters that the large number of one–race schools has been caused by the population distribution of East Baton Rouge Parish. The board says that the schools have to be located where the people live and that whites tend to live among whites and blacks among blacks, a well known human phenomenon over which the board has no control. Further, the affidavits of Dr. Aertker and Dr. Lindsey establish that, at least since 1963, no child in East Baton Rouge Parish has been denied attendance at a public school because of his race.

It is undisputed that most black schools are located generally in the western portion of the parish and that most white schools are located generally in the eastern portion of the parish and that, again generally speaking, the schools falling in between are racially mixed. While the school board has not offered any racial population statistics, it states that this distribution coincides generally with the racial residential distribution of the parish.

The school board declares that there are no facts which would support the conclusion that the board has followed a policy of "purposeful discrimination" in the assignment of children to particular schools, in the construction of new schools, in the closing of old schools or in any other fashion and that it cannot be held responsible for the racial imbalance in residential distribution in the parish.

■ We break no new legal ground here. The law is well settled, both procedurally and substantively. Rule 56, Fed.R.Civ.P., authorizes summary judgment where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Summary judgments have been granted in desegregation cases such as this. *Barrett v. Craven County Board of Education*, 70 F.R.D. 466 (E.D. N.C.1976); *United States v. Mississippi*, Civil Action No. 4706 (S.D.Miss.1980) (unreported). Thus, if the facts and the law justify it, summary judgment may be granted without regard to the nature of this litigation.

■ The "deliberate speed" of *Brown v. Board of Education, supra*, has evolved into a continuing and affirmative duty upon each school board where racial segregation in public schools was formerly state imposed, to convert to a unitary school system. *Green v. County School Board of New Kent Co., Va.*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). That duty as defined and refined by the Supreme Court and the Fifth Circuit is to eliminate all "vestiges of state–imposed segregation" from public schools. *Swann, supra*, 91 S.Ct. at 1275. The Supreme Court has recently indicated that the same burden may be applied to school boards in other parts of the nation where de facto school segregation has been practiced without the sanction of formal statute. *Columbus Board of Education v. Penick*, 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979); *Dayton Board of Education v. Brinkman*, 443 U.S. 526, 99 S.Ct. 2971, 61 L.Ed.2d 720 (1979). Clearly, the Fifth Circuit, which has probably considered more desegregation cases than all of the other circuits combined, has repeatedly emphasized the affirmative duty upon local school boards to completely dismantle the former dual school system. The Fifth Circuit has consistently required new plans where those being utilized by the local officials did not accomplish the stated objective. See, for example, *Singleton v. Jackson Municipal Separate School District*, 419 F.2d 1211 (5th Cir. 1969), *Carter et al. v.*

*West Feliciana Parish School Board No. 944,* judgment vacated in part, 396 U.S. 226, 90 S.Ct. 467, 24 L.Ed.2d 382 (1969), judgment reversed, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477 (1970), writs denied, 396 U.S. 1032, 90 S.Ct. 611, 24 L.Ed.2d 530, 396 U.S. 1032, 90 S.Ct. 612, 24 L.Ed.2d 530 (1970); *Tasby v. Estes,* 572 F.2d 1010 (5th Cir. 1978), writ granted, 440 U.S. 906, 99 S.Ct. 1212, 59 L.Ed.2d 454 (1979), writ dismissed as improvidently granted, 444 U.S. 437, 100 S.Ct. 716, 62 L.Ed.2d 626 (1980); *Anderson v. Dougherty County Board of Education,* 609 F.2d 225 (5th Cir. 1980); *Lee v. Macon County Board of Education,* 616 F.2d 805 (5th Cir. 1980); *Lee v. Linden City School System,* 617 F.2d 383 (5th Cir. 1980).

 It goes without saying that in the absence of a constitutional violation there is no warrant or basis for a federal court to become involved in the affairs of the local school board. Here, the original constitutional violation is undisputed; the East Baton Rouge Parish school system was, by law, racially separated before 1954. The Supreme Court has pointed out that in school systems which have been deliberately constructed and maintained to enforce racial segregation the local authorities must effectively dismantle the dual system; this means that they must eliminate racial discrimination "root and branch." *Swann, supra* 91 S.Ct. at 1275. In those districts with histories of state–imposed segregation, racially neutral student assignment plans are not necessarily sufficient; they must fully and completely counteract the continuing effects of past school segregation. *Swann, supra* 91 S.Ct. at 1282. While neither neighborhood schools, nor the existence of a few one–race schools, *per se,* offends the Constitution, the school authorities bear the burden of proving that the racial composition is not the result of *past* or present discriminatory action. There is a presumption against any system with one–race schools. *Swann, supra* 91 S.Ct. at 1281; *Lee v. Macon County Board of Education, supra* at 809.

 Here, the undisputed facts point inexorably to the conclusion that the East Baton Rouge Parish School Board has not successfully dismantled the former dual system. We measure the facts against the standards mandated by the Fifth Circuit in this specific case.

First, if the evidence shows continued existence of one–race schools, the school board will have the burden of proving that assignments are genuinely nondiscriminatory. Second, the Court is bound to scrutinize all one–race schools and the burden will be upon the board to prove that they are not the result of present or past discriminatory action. Third, if the evidence shows continued existence of one–race schools the Court must apply a presumption against the school board that one–race schools are the result of the board's discriminatory actions.

It is undisputed here that 60 percent (67 of 113) public schools in East Baton Rouge Parish are one–race schools and that a majority of the students of both races attend one–race schools. The school board has shown by affidavits that no child has been excluded from a particular school because of race. That alone, however, does not carry the burden imposed upon the board. As the Supreme Court pointed out in *Swann, supra,* simply removing statutory racial barriers is not enough; school assignments are not generally nondiscriminatory unless the board exerts every effort to eradicate the effects of past state–imposed segregation.

The undisputed facts show that 12 of the 22 black schools which were operated in 1954 have continued in existence as all–black schools and that the board has constructed a significant number of new black schools as well as new white schools. Since the evidence shows that all–black schools have continued in existence, it is presumed that they are the result of the board's discriminatory action.

Here, the board relies upon *Carr v. Montgomery County Board of Education,* 377 F.Supp. 1123 (M.D.Ala.1974), affirmed, 511 F.2d 1374 (5th Cir. 1975), cert. denied, 423 U.S. 986, 96 S.Ct. 394, 46 L.Ed.2d 303 (1975). In that case the district court approved and the Fifth Circuit affirmed a neighborhood

school plan which left one completely all-black school and a few schools with substantially predominantly black student populations. The Court specifically found that due to the peculiarities of location and the board's prior efforts to desegregate the one remaining completely black school it was not practical to take any further desegregation efforts as regards that school. The court, in approving the plan, commented:

"It is significant to an overall evaluation of the board's plan that all of the students in the Montgomery school system will attend a substantially desegregated school for the majority of their school careers. Over 80 percent of the black children in the system will attend a substantially desegregated school for at least six grades of the 12. One hundred percent of the black children in the system will attend a substantially desegregated senior high facility. At the junior high school level, the only junior high facility under the board's plan that is projected to be over 80 percent black will be the McIntyre Junior High facility which, as this Court has previously noted, is impossible to effectively desegregate in a stable and workable manner." (377 F.Supp. at 1132)

We contrast that factual situation to the undisputed facts before this Court which show that a majority of the children of both races in East Baton Rouge Parish still attend one-race schools and that 60 percent of the entire school system consists of one-race schools.

The school board also relies upon the recent case of *City of Mobile, Ala. v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). That case involved a claim that an at-large municipal election system diluted the voting strength of black voters. The Supreme Court did hold clearly that racially discriminatory motivation is an essential element of a claim under the equal protection clause of the Fourteenth Amendment. The board's reliance upon that decision here is, however, misplaced. This is not a voting rights case and the racially discriminatory motivation is established by

reason of the former Louisiana laws requiring a dual educational system. As the jurisprudence cited above clearly demonstrates, local school authorities in the South bear the continuing burden of eliminating the former dual school systems and until the construction of a unitary system is completed, the presumption is against the board. *Carr v. Montgomery County Board of Education, supra; Swann, supra.*

For the foregoing reasons, the Court concludes that the school board has not borne its burden of proving that it has successfully dismantled the former dual school system in this parish, and on this issue the motion for summary judgment will be GRANTED. Plaintiffs-intervenors are entitled to further relief.

*The Teacher Assignment Issue*

The government and plaintiffs-intervenors also complain that the teacher reassignment plan in effect since 1970 has led to placement of less experienced teachers in black schools and more experienced teachers in white schools, which lowers the quality of education of black students.

The 1970 court order makes reference to the teacher reassignment plan:

"The proposed plan provides for the assignment of teachers and administrative personnel in such a manner as to maintain a ratio of black to white teachers in each school substantially the same as the ratio of such teachers in the system as a whole. No teacher, black or white, is being dismissed or demoted as a result of this plan, and the central office staff is completely integrated."

This provision of the plan was incorporated in obedience to the doctrine of *Singleton v. Jackson Municipal Separate School District, supra,* and the school board has been following that policy for the last ten years. The undisputed facts establish that there are about 3,300 teachers in the school system, 2,150 white and 1,150 black, a ratio of 65 percent to 35 percent. Some 14 percent have less than three years of teaching experience and are, under Louisiana law, "untenured." The statistics offered by the

government show that about 22 percent of classroom teachers assigned to schools where the enrollment is 60 percent or more black have three years or less teaching experience, while about 9 percent of teachers assigned to schools where the enrollment is 80 percent or more white have three years of experience or less.[5] Many other statistics are offered in support of the proposition, and it does appear that factually there probably are more teachers in "black schools" with three years or less teaching experience than there are in "white schools." The school board has responded by saying that this was all done in an attempt to comply with the provisions of the plan relative to maintaining a ratio of black–to–white teachers at each school substantially the same as the ratio of the teachers in the system as a whole.

The government has not offered any evidence to support the postulate upon which this argument is predicated, namely, that lack of teachers with three years or more experience in "black schools" has diluted the quality of education in those schools. There is no evidence of any sort in this record to support that proposition and the school board vigorously disputes it.

Since summary judgment is appropriate only where the facts are undisputed, it is obvious that summary judgment cannot be rendered on this issue.

### Conclusion

The school board, in brief, argued alternatively that it be granted a period of 120 days within which to prepare and submit an additional desegregation plan. The Court rejects that request. Since May 25, 1978, when the Fifth Circuit reversed the 1975 decision of this Court, the ruling made today should have been anticipated by the board. Additionally, on July 18, 1979, the district court ordered the school board to prepare and file an extensive report concerning the elimination of any remaining

one–race schools and that report was filed on November 1, 1979. All of that data is available to the board and it should have been working on such a plan, at least as a contingency, all during that time.

The defendant, East Baton Rouge Parish School Board, is hereby ORDERED to submit a proposed plan for additional desegregation of the public schools by October 15, 1980. Trial of this matter beginning October 27, 1980, will be limited to a consideration of the effectiveness of this proposed plan, together with any unresolved issues arising out of the original motion for further relief filed by plaintiffs–intervenors.

This Court now places no specific requirements as to the details of the plan; its purpose, however, must be to effectively dismantle the former dual school system. In the development of the plan, the board is hereby ORDERED to utilize the following criteria:

"1. To achieve a unitary school system.

"2. To provide an organizational structure which will ensure optimum educational opportunities for all children with a minimum of disruption.

"3. To adjust the assignment of students to available physical facilities.

"4. To utilize available funds to the greatest educational advantage.

"5. To achieve the maximum possible community acceptance of the plan thereby resulting in minimal resegregation.

"6. To reassign students in a manner which enhances the instructional program of the system.

"7. To provide for maximum teachability through the matching of assignments with teacher competencies and training.

"8. To utilize the existing transportation in a supportive role to the instructional and organizational framework of the system.

---

5. We note that the government does not use an equal comparison here since the criteria is *60* percent or more black student enrollment and *80* percent or more white students. One ought to use either the 60 percent or the 80 percent numbers for both sets of schools, and we assume that the manner of presentation has the effect of increasing the percentage of inexperienced teachers in black schools.

"9. To minimize disruptive transition for students, school personnel, and parents and at the same time comply with the mandate of the courts in achieving a unitary system." (*Carr v. Montgomery County Board of Education*, 377 F.Supp. at 1131)

This Court has neither the ability nor the inclination to serve as a "super–superintendent of public schools" and will leave it to the school board to formulate, in good faith, a plan for further desegregation which will discharge the board's obligation under the Constitution of the United States. Only if the board refuses to perform its constitutional duty will the Court formulate its own plan.