Arlam CARR, Jr., et al., Plaintiffs,

National Education Association, Inc., and
Penelope Anne Jenkins, et al.,
Plaintiff-Intervenors.

United States of America,
Amicus Curiae,

v.

MONTGOMERY COUNTY BOARD OF
EDUCATION, et al., Defendants.

Civ. A. No. 2072–N.

United States District Court,
M. D. Alabama, N. D.

May 22, 1974.

Fred D. Gray and Solomon S. Seay, Jr. (Gray, Seay & Langford), Montgomery, Ala. and Tuskegee, Ala., for plaintiffs. These attys. also represent plaintiff-intervenor National Education Assn., Inc.

Howard A. Mandell, Montgomery, Ala., for Penelope Anne Jenkins and others.

Ira DeMent, U. S. Atty., and Kenneth E. Vines, Asst. U. S. Atty., Montgomery, Ala., Brian K. Landsberg, Joseph D. Rich and William C. Graves, Attys., Civil Rights Div., Dept. of Justice, Washington, D. C., for the United States.

Vaughan Hill Robison and Joseph D. Phelps (Robison, Belser, Brewer & Phelps), Montgomery, Ala., for the defendants.

## OPINION

JOHNSON, Chief Judge.

This school desegregation case, having been previously before this Court and

the appellate courts upon several occasions, is again submitted. The present submission is upon the pleadings, the evidence presented orally over a period of several days, and the briefs and arguments of the parties. Upon this submission this Court now makes appropriate findings of fact and conclusions of law. As authorized by Rule 52, Federal Rules of Civil Procedure, these findings and conclusions are incorporated in this memorandum opinion.

## I. HISTORY OF CASE

This case was originally filed in May, 1964, when a group of black children and their parents, with the United States participating as *amicus curiae*, asked this Court to enjoin the Montgomery County Board of Education from "continuing the policy, practice, custom, and usage of maintaining and operating a compulsory biracial school system."[1] Although ten years had passed since the Supreme Court's decision in Brown v. Board of Education,[2] the schools of Montgomery County, as was true in many areas of the United States, were completely segregated; one set of schools was operated exclusively for white students and staffed entirely by white teachers, and one set was operated for black students and staffed by black teachers. Thus, on July 31, 1964, this Court declared that the Montgomery schools were being operated in violation of the law of the United States and enjoined defendants from continuing to operate these schools on a racially segregated basis.[3] But this Court fully "realized that desegregation of the public schools cut across the social fabric of this community and that there were both administrative and other practical problems for the board to cope with in order to comply with the law."[4] Consequently, the board was allowed to proceed with desegregation in a gradual manner. A freedom-of-choice plan proposed by the board as the means for integrating four grades was accepted.

Almost two years later, on March 22, 1966, this Court ordered that the freedom-of-choice plan be implemented in 10 of the 12 grades for the 1966–67 school year and that the plan be fully operative throughout the system commencing with the fall of 1967.[5] In addition, this Court decreed that:

> Race or color will henceforth not be a factor in hiring, assignment, reassignment, promotion, demotion, or dismissal of teachers and other professional staff, with the exception that assignments shall be made in order to eliminate the effects of past discrimination.[6]

On August 17, 1967, and February 7, 1968, the United States requested this Court to require defendants to take further steps to disestablish the dual school system in Montgomery County. Upon review of the record, this Court found that the school board had failed to dis-

---

1. Carr v. Montgomery County Board of Education, 232 F.Supp. 705 (M.D.Ala.1964).

2. 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

3. At the time this Court entered its order in July, 1964, there were approximately 25,000 white students and 15,000 black students attending the Montgomery County school system.

4. 289 F.Supp. at 657.

5. Carr v. Montgomery County Board of Education, 253 F.Supp. 306 (M.D.Ala.1966).

6. *Id.* at 310. This decree originally required the process of desegregating the faculty and professional staffs to commence with the school year 1966–67. But when the Fifth Circuit subsequently allowed the Mobile County system until the school year 1967–68 to end its policy of hiring and assigning teachers and staff by race, this Court, on its own motion, modified the March 22 order to give the Montgomery board an additional year before requiring desegregation of the system's faculty and staff. Again, this Court was cognizant of the administrative problems and practical ramifications of its order, and thus sought to give the board some additional time in which to meet its constitutional obligation to desegregate Montgomery's dual school system.

charge its affirmative duty to eliminate the dual school system.[7] Under the freedom-of-choice plan, only 550 blacks were attending traditionally white schools. No white children were attending traditionally black schools. Of the approximately 550 black teachers and 815 white teachers, only 32 were teaching in schools that were predominantly of the opposite race.

On the basis of this evidence, it was found necessary to establish specific requirements governing minimum amounts of progress in future desegregation efforts. First, this Court ordered that the board must move toward a goal under which the ratio of white to black faculty members in each school was substantially the same as it was throughout the system.

Second, the school board was required to obtain approval from the State Superintendent of Education prior to the construction of any new school or any additions to existing schools.

Third, the board was ordered to eliminate race as a factor in the assignment of students to school buses and in its designation of bus routes. Finally, this Court observed that the board's freedom-of-choice plan was not working and that unless the plan became more effective in eliminating the dual school system, the Court would have no alternative except to order some other plan.[8]

For the first time in this case, defendants appealed this Court's order.[9] On appeal, the Fifth Circuit affirmed the March 2, 1968, order.[10] A petition for rehearing *en banc* was denied by the Fifth Circuit.[11] Finally, the Supreme Court granted *certiorari* and also affirmed this Court's order.[12]

In the summer of 1969, plaintiffs and the United States again filed motions asking this Court to require the board to take additional steps to disestablish Montgomery's dual school system.

An evidentiary hearing was held on February 24, 1970, to consider plans submitted by the United States and the board. The board's plan essentially adopted the basic elements of the plan proposed by the government experts with some minor changes and refinements.[13] Under the board's

---

7. Carr v. Montgomery County Board of Education, 289 F.Supp. 647 (M.D.Ala.1968).

8. In its supplemental order granting partial stay of the order pending appeal, this Court observed that the board had attempted to operate part of the Montgomery system under the freedom-of-choice plan and part under the neighborhood school plan. Under this scheme, the board sought to perpetuate a series of segregated schools in exclusively white neighborhoods. Needless to say, this Court found this to be an egregious violation of the board's affirmative duty to establish a unitary school system.

9. This fact is significant in that it underscores the efforts of the Montgomery board to comply with the law as reflected by the mandates of this Court. Unlike many school boards that opposed desegregation at every step, the Montgomery County Board of Education recognized that it had an affirmative duty to desegregate its school system. As the Fifth Circuit noted on appeal, "good faith conduct on the part of any litigant in any court, especially in a court of equity and, more particularly, in the sensitive area of desegregation, is a vital element for appropriate consideration." 400 F.2d 1, 2 (5th Cir. 1968).

Although the board contended that this Court's order was unprecedented in its imposition of "ratio" requirements, this Court was firmly convinced that its order was "the *minimum* the applicable law will allow under the peculiar facts and circumstances presented and that each and every feature of the order and injunction entered in this case on February 24, 1968, is not only authorized but *required* by the applicable law." 289 F. Supp. at 660 (emphasis added).

10. 400 F.2d 1, 8 (5th Cir. 1968).

11. 402 F.2d 782 (5th Cir. 1968).

12. United States v. Montgomery County Board of Education, 395 U.S. 225, 89 S.Ct. 1670, 23 L.Ed.2d 263 (1969). The Supreme Court concluded its opinion by noting that "it is good to be able to decide a case with the feelings we have about this one. The differences between the parties are exceedingly narrow." *Id.* at 236.

13. This plan included proposals to close certain schools in the system, to pair several

projections for the 1970–71 school year, this plan provided that there would be no all-white schools in the county and only one all-black school. Over plaintiffs' objections that this plan did not go far enough in eliminating the dual school system, this Court approved the board's plan with some modifications of its own.[14] On appeal, the Fifth Circuit affirmed this Court's decision to implement the board's plan.[15] The Fifth Circuit added the following cautionary note:

> Once a school board has acted, however, the courts have a solemn obligation to determine whether the structure designed by the school board will house a unitary school system. This obligation is unremitting, and there can be no abdication, no matter how temporary. Accordingly, any imprimatur of judicial approval must be entered with the caveat that until construction of a unitary system is completed, change orders, when appropriate, will be issued to ensure that the designed structure in fact accommodates a unitary system and not a bifurcated one.[16]

Since this Court's order of February 25, 1970, the board's plan has remained largely unaltered. The board has worked with plaintiffs and the United States in an effort to keep its plan updated, and changes in attendance zones and school facilities have been proposed and approved by this Court. But changes in the facts of this case—largely changes in residential patterns—and

recent clarifications by the Fifth Circuit and the Supreme Court of the obligation of a school board to establish a unitary school system now necessitate an overall evaluation of this system's compliance with the requirements of the law. Accordingly, on August 29, 1973, all parties were ordered to submit their suggestions and proposals for the further desegregation of the Montgomery system.

It is important at this point to emphasize two factors that have characterized this continuing litigation. First, this Court has often recognized the practical problems and administrative difficulties in eliminating a dual school system that had been closely tied to long-established social patterns.[17] A successful school system demands support from the community—both black and white. To facilitate this support, this Court has attempted to avoid imposing rigid or inflexible requirements on the board and, where possible, has allowed the parties to work out their own differences. In this way, this Court has constantly strived for a workable solution to the problems encountered in converting from a dual system to a "unitary system in which racial discrimination would be eliminated root and branch."

Second, all the parties to this litigation share the same goal: establishment of a "desegretated, unitary and nonracial school system." [18] Every court that has reviewed the record of this litigation has observed that the differences between the parties have been unusually

---

rural schools, to adopt neighborhood zoning of the schools within the city of Montgomery, and to transport students from nonzoned rural areas to schools within the city.

14. In its order, this Court made clear that the law does not require racial balance or similar student ratios throughout a school system. "Complete disestablishment of the dual school system to the extent that it is based upon race is required."

15. 429 F.2d 382 (5th Cir. 1970). In addition, the Circuit Court directed that the majority-to-minority transfer provisions of the plan be altered to reflect a change in the law since this Court's order of February 25, 1970.

16. 429 F.2d at 386.

17. See, e. g., 289 F.Supp. at 657. See also note 6, supra.

18. Brief for the board before the Supreme Court. See 395 U.S. 225, 236, 89 S.Ct. 1670, 23 L.Ed.2d 263 (1968).

small.[19] Moreover, the Montgomery County School Board has been repeatedly complimented for its good faith efforts to comply with the requirements of the law.[20] It is worthy of pride that the ten-year history of this case has been characterized throughout by cooperation from all the participants.

## II. AN ANALYSIS OF THE PLANS BEFORE THE COURT

A number of desegregation proposals have been submitted for the Court's consideration. In evaluating these proposals, it is important to keep in mind that the real controversy now presented centers around the operation of the elementary schools.

On January 15, 1974, the defendant board submitted its initial proposal, and the United States submitted a number of detailed suggestions. On February 14, 1974, the United States submitted a response to the defendants' first proposal, which incorporated additional desegregation suggestions. On February 16, 1974, the plaintiffs submitted their plan. On March 29, 1974, the defendants submitted their second plan, which was a revision of their January 15 proposal. On April 1, 1974, the plaintiff-intervenors submitted their proposal. In addition, the United States proposed a high school desegregation plan devised by authorities at the Maxwell Air Force Base in February and March, 1974. By letter of April 5, 1974, to the Court, the United States withdrew this proposal. Finally, on May 8, 1974, the school board presented to the Court certain modifications and adjustments to its March 29, 1974, plan.

### A. *Plaintiffs' Plan*

Plaintiffs' proposed plan was devised by Dr. Gordon Foster, Director of the University of Miami Title IV Desegregation Center. The Foster plan at the senior and junior high school levels in general starts with the existing board proposal and seeks to achieve greater desegregation by the rerouting of existing bus routes and the reassignment of students to other schools which would require considerable increase in transportation. On the high school level, the Foster plan does not differ significantly from the board's plan. At the elementary level, through a combination of pairing of contiguous schools and clustering and pairing of noncontiguous schools, the Foster plan proposes to desegregate the schools within the system within the "15 percent" guidelines established by Dr. Foster. Dr. Foster testified that contiguous pairing was used wherever possible to minimize transportation. However, because of the degree of residential segregation in Montgomery, this was felt by Dr. Foster to be feasible in only three instances. The pairing and clustering of elementary schools was the means used by Dr. Foster to bring each elementary school in each paired or clustered group, under his plan, within one-tenth of one percent of the exact racial percentage in each of the schools paired or clustered with two exceptions. The exact racial balance varies by two-tenths of one percent in these exceptions. The schools paired or clustered range in grade structures one-two, one-three, one-four, three-six, four-six, five-six, and 11 elementary schools under the plaintiffs' plan are grades one-six. The

19. 395 U.S. at 236. See note 12, *supra.* 400 F.2d at 2 ; 429 F.2d at 386–387.

20. This Court has often complimented the board on the performance of its constitutional obligation to desegregate the Montgomery schools. See 400 F.2d at 3 n. 3. Appellate courts, upon the review of this record, have similarly expressed their approval of the board's good faith efforts throughout these proceedings. See 395 U.S.

at 230, 236 ; 400 F.2d at 2–3. An example of this approval by the Fifth Circuit: "If more district courts and more school boards had been as sensitive as those here involved to the requirements of the law, the path to the goal of school desegregation in this circuit would have been infinitely smoother than it has been." Carr v. Montgomery County Board of Education, 429 F.2d 382 (5th Cir. 1970).

evidence reflects that the pairing or clustering of schools as proposed by the plaintiffs' plan would require extensive cross-city busing from beyond the westernmost part of the city to beyond the easternmost part of the city and the same is true from east to west. Elementary children at all grade levels, one through six, would be involved in this cross-city busing. It is evident, and this Court finds, that fracturization of grade structure and the pairing and clustering of schools in the Montgomery school system, as proposed by the plaintiffs, is for the sole purpose of attaining a strict racial balance in each elementary school involved.

Forty-three percent of the total number of elementary students enrolled in the Montgomery school system would be reassigned under the plaintiffs' plan. The plan would also necessitate the reassignment of a large number of elementary teachers since the teachers within the system should continue to teach at the grade levels where they have attained the greatest competency. This Court is impressed that the plaintiffs' plan would be disruptive to the educational processes and would place an excessive and unnecessarily heavy administrative burden on the school system.

The plaintiffs' plan for the junior high school level adopts basically the defendant board's plan with certain significant changes. These changes consist of new cross-city and cross-county busing. This busing is proposed by the plaintiffs in order to bring the projected percentages of black students enrolled in each junior high school within the system within the 15 percent tolerance allowed under Dr. Foster's plan.[21] Dr. Foster's proposal would require a reassignment of 36 percent of the total junior high school enrollment in the system.

Dr. Foster proposes a plan of desegregation at high school level which requires noncontiguous and satellite zoning to more racially balance each high school. To accomplish this, 22 percent of all high school students would be reassigned from schools they presently attend.

Following is a summary of newly assigned and additionally transported students under the plaintiffs' plan:

| Grade Level | Number Reassigned | Percentage of Total Enrollment Reassigned |
|---|---|---|
| 1– 6 | 7,555 | 43 |
| 7– 9 | 3,493 | 36 |
| 10–12 | 1,637 | 22 |

A total of 12,685 students, or 36 percent of the total enrollment in the Montgomery school system, would be reassigned under the plaintiffs' plan.

The students requiring additional transportation under the plaintiffs' plan are as follows:

Elementary (1–6) 5,204
Junior High School (7–9) 1,642
Senior High School (10–12) 350

### B. *Plaintiff-Intervenors' Plan*

The plaintiff-intervenors' plan was prepared by Dr. Larry Winecoff, a professor at the University of South Carolina. Dr. Winecoff originally submitted two plans, Plan A, with Plan A Alternate, and Plan B. Dr. Winecoff abandoned Plan B, and no evidence was offered in support of that plan. Dr. Winecoff set

21. Dr. Foster uses a 15 percent variation or tolerance to determine the racial identifiability of the elementary and junior high schools in the system. That is to say, any elementary or junior high school with an enrollment of less than 33.5 percent black is racially identifiable as white. If the enrollment is more than 63.5 percent black the school is racially identifiable, according to Dr. Foster, as black. These variations are determined on the elementary and junior high school levels on the basis that 48.5 percent of the total elementary and junior high school students enrolled in the system are black and that 45.5 percent of the total high school enrollment is black.

similar guidelines to those used by Dr. Foster in determining those schools which he considered to be racially identifiable in the Montgomery school system.[22] However, Dr. Winecoff used 10 to 15 percent as his tolerance in determining racial identifiability.

At the elementary level the grade structure of every elementary school within the system is fracturized under the plaintiff-intervenors' Plan A. This is done by dividing the existing one through six elementary grades into one through three centers and four through six centers. Dr. Winecoff also uses the rezoning technique of strip zones running generally vertically for grades one-three and elongated horizontally for grades four-six. He also uses noncontiguous satellite zoning in his one-three grades Plan A. The evidence reflects that four of the 16 elementary schools within the system, serving grades one-three, would still be racially identifiable according to Dr. Winecoff's standards under his Plan A, one-three.

In Plan A, one-three alternate, Dr. Winecoff uses the same zone lines as used in his Plan A, one-three. Judged by his tolerances, 11 of the 16 schools serving grades one-three within the system would continue to be racially identifiable under Dr. Winecoff's Plan A, one-three alternate.

Plaintiff-intervenors' Plan A, four-six, uses elongated horizontal zones extending from the east side of the city to the west side of the city. This type of strip zoning would of necessity require substantial additional transportation and would also result in many elementary children having to walk a considerable distance farther to school. In some instances they would be required to walk past another elementary school serving grades one-three. Under this proposal, five of 13 schools serving grades four-six would continue to be racially identifiable according to Dr. Winecoff's tolerances.

The evidence reflects that from 60 to 70 percent of all elementary school students within the Montgomery system would be reassigned under plaintiff-intervenors' Plan A, one-three or one-three alternate, and Plan A, four-six. Furthermore, new transportation would be required for approximately 2,000 elementary grade children under the plaintiff-intervenors' elementary plans.

Plaintiff-intervenors' junior high school plan uses strip zoning of an elongated shape running obliquely. In some instances the seven-nine school zones proposed are only four blocks in width. From 50 to 60 percent of all students enrolled within the system in grades seven through nine would be reassigned under plaintiff-intervenors' junior high level proposal. Furthermore, approximately 2,000 students would be newly transported.

The plaintiff-intervenors' senior high plan uses strip zones. For instance, the zone for the Jeff Davis school is from two to four blocks in width in certain areas. This proposal would require the reassignment of from 30 to 40 percent of the total high school enrollment within the system. The evidence reflects, and this Court now finds, that the plan proposed by the plaintiff-intervenors for the elementary, junior high, and senior high schools in the Montgomery school system is designed to achieve a racial balance in these schools.

### C. The School Board's Plan

The school board utilizes transportation route changes, involving both black and white students, zone changes, the closing of physically inferior schools, the consolidation of schools, and the construction of new schools in its proposed plan for the system. Mr. Silas Garrett, Superintendent of Education for the school system and an experienced school administrator, testified that the follow-

---

22. See note 21, *supra.*

ing are the criteria that were utilized in formulating the board's plan:

1. To achieve a unitary school system.

2. To provide an organizational structure which will ensure optimum educational opportunities for all children with a minimum of disruption.

3. To adjust the assignment of students to available physical facilities.

4. To utilize available funds to the greatest educational advantage.

5. To achieve the maximum possible community acceptance of the plan thereby resulting in minimal resegregation.

6. To reassign students in a manner which enhances the instructional program of the system.

7. To provide for maximum teachability through the matching of assignments with teacher competencies and training.

8. To utilize the existing transportation in a supportive role to the instructional and organizational framework of the system.

9. To minimize disruptive transition for students, school personnel, and parents and at the same time comply with the mandate of the courts in achieving a unitary system.

At the present time, the Montgomery school system is operating pursuant to a desegregation plan which was prepared by a team of HEW experts and which was approved by this Court and by the United States Court of Appeals for the Fifth Circuit.[23] The plan when originally approved assigned both black and white students to every school in the system with the exception of Loveless School, which the Court of Appeals found to be a facility located so deep in the heart of a black residential area as not to be practical to desegregate. Since the implementation of the 1970 plan, the evidence in this case reflects that the school board has attempted in good faith to ensure its effective operation. Additionally, since 1970, the school board has furthered the desegregation of the Montgomery system by closing the Billingslea elementary facility and consolidating that school with the Morningview School. The board proposes extensive plans for the transition of the Georgia Washington School, one-nine, now an all-black facility, into a substantially desegregated junior high school complex. Further substantial desegregation is proposed by the board in assigning white students to Carver Senior High and Carver Junior High. The board projects 61 percent whites in both schools that have heretofore been practically all-black. Many other significant and effective assignments are to be made by the board—in each instance to attempt to achieve a unitary school system. Extra-curricular activities have been expanded on a desegregated basis and inter-school participation through joint seminars and educational clinics has been developed.

The evidence reflects that the board considered the techniques of satellite zoning, clustering and pairing. However, the board concluded that it could establish a unitary system through the means and methods enumerated without the disruptions of satellite zoning, clustering and pairing as proposed by the plaintiffs and plaintiff-intervenors in order to achieve what the evidence in this case reflects would be an extremely unstable desegregated school system.

The evidence presented to the Court further reflects that the population of Montgomery is so arranged that whites largely live on the east side of the city and blacks on the west. This necessarily means that pairings and clusterings would, in the main, be noncontiguous and would require cross-city busing. This, of course, would substantially increase the time and distance that students would have to travel to and from the schools to which they would be assigned under such plan.

---

23. Carr v. Montgomery County Board of Education, 429 F.2d 312 (5th Cir. 1970).

Under the board's plan, there will remain a few schools with a substantially predominantly black student population. All of these are at the elementary level with the exception of McIntyre Junior High.[24]

An in-depth analysis of the school board's plan impresses this Court that the continued existence of some substantially predominantly black schools is genuinely nondiscriminatory. These schools, Daisy Lawrence, Booker T. Washington Elementary, Carver Elementary, Fews, Loveless, Hayneville Road Elementary, Paterson, Pintlala, Davis and Bellinger Hill, are in each instance located deep in black residential areas; the white students residing in these areas are assigned to the nearest of these schools. While this has to some extent desegregated practically all of these schools, no ratio has been accomplished that satisfies the plaintiffs and plaintiff-intervenors. The evidence reflects, and this Court finds, that in order to further desegregate any of these facilities, satellite zoning and the cross-city busing of white students would be necessary.[25] Further, an exchange of black students would have to be made by transporting them across the city from these school areas. This would not, under the circumstances of this case, accomplish any effective and realistically stable desegregation. In each instance the situation is a result of residential patterns and not of the school board's action—either past or present.

It is significant to an overall evaluation of the board's plan that all of the students in the Montgomery school system [26] will attend a substantially desegregated school for the majority of their school careers. Over 80 percent of the black children in the system will attend a substantially desegregated school for at least six grades of the 12. One hundred percent of the black children in the system will attend a substantially desegregated senior high facility.[27] At the junior high school level, the only junior high facility under the board's plan that is projected to be over 80 percent black will be the McIntyre Junior High facility which, as this Court has previously noted, is impossible to effectively desegregate in a stable and workable manner.

A detailed analysis of the board's plan is attached and marked as Table 2 to this opinion. The chief criticism of the plaintiffs and plaintiff-intervenors of the board's plan is that the board is putting the primary burden of desegregating the Montgomery school system on the black students. The evidence does not bear this out. Approximately 4,000 white students and 5,000 black students are reassigned under the school board's plan. Furthermore, on the junior high level the board's plan proposes that three virtually all-black facilities be converted into predominantly white ones, that is, Carver Junior High from zero percent white to 61 percent white; Georgia Washington from zero percent white to 69 percent white, and Houston

---

24. Plaintiff-intervenors also project a heavily black enrollment at McIntyre. Plaintiffs would, under their proposal, achieve a projected 50 percent black-white ratio at McIntyre Junior High. However, this would be accomplished by satellite zoning and by transporting 550 whites for a considerable distance from the satellite Cloverdale area and periphery area to the McIntyre school. The only purpose in this is to attempt to achieve a racial balance in this school that is located deep in a black residential area.

25. It is significant that Dr. Winecoff under his Plan A alternate leaves Carver Elemen-

tary at 85 percent black. Under his Plan A, Dr. Winecoff proposes to bus approximately 200 white students from the various school areas to Carver which would still leave Carver Elementary at 61 percent black. These students would have to pass three or four elementary schools to arrive at Carver.

26. The only exception involves those students in the Montgomery County High-Dunbar Elementary area—and neither the plaintiffs nor the plaintiff-intervenors seriously attempt to desegregate these schools.

27. For instance, Lanier—57 percent white, or Carver—61 percent white.

Hill from 15 percent white to 65 percent white.

As to the proposal of the board regarding the senior high schools within the system, the evidence reflects that all of the city senior high schools will be substantially desegregated.

### III. APPLICABLE LAW

██ For several years it has been clear, and all parties in this case recognize, that

> the obligation of every school district is to terminate dual school systems at once and to operate now and hereafter only unitary schools.

Alexander v. Holmes County Bd. of Educ., 396 U.S. 19, 20, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969). In determining what constitutes a "unitary" school system, there are six facets of school operation which must be considered. These six criteria are (1) faculty, (2) staff, (3) transportation, (4) extracurricular activities, (5) facilities, and (6) composition of the student body. Green v. County School Bd., 391 U.S. 430, 435, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); Adams v. Rankin County Bd. of Educ., 485 F.2d 324, 325 (5th Cir. 1973).

### A. *Faculty and Staff*

██ In 1968, this Court ordered that the Montgomery County School Board must move toward a goal under which "in each school the ratio of white to Negro faculty members is substantially the same as it is throughout the system." As observed earlier, the United States Supreme Court affirmed that order. United States v. Montgomery County Bd. of Educ., *supra.*

An analysis of the evidence presented in this case [see Table 1] shows that the board is in full compliance with that order.

### B. *Transportation, Extra-curricular Activities, Facilities*

There is no dispute as to the law regarding these indicia of desegregation. Suffice it to say that there can be no racial discrimination in any of these areas of school operation. None of the parties seriously contend the board is not in full compliance with the law in these areas. Appropriate factual findings will be made as to each criterion.

### C. *Student Body Composition*

██ While it is clear that in disestablishing a segregated school system all vestiges of racial segregation must be eliminated "root and branch," Green v. County School Bd., 391 U.S. 430, 437–438, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), the establishment of a fixed racial quota in each school is not required by the United States Constitution. The United States Supreme Court has ruled that

> [t]he constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole.

Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 24, 91 S.Ct. 1267, 1280, 28 L.Ed.2d 554 (1971).

Thus, it appears that a balance must be reached, one unquestionably subtle in its implications: while school system segregation must be actively disestablished, racial quotas for student population are not to be instituted.

The difficulty of analysis is most acute when the Court is confronted, as it is in this case, with several schools which contain a student population which is largely of one race. Since this Court last considered the compliance of this school system with constitutional commands, many important cases have been decided by the appellate courts, necessitating a re-examination of the law with respect to schools whose student population does not typify the general population figures. The Supreme Court has, in a general manner, addressed the question of one-race schools, writing in *Swann* that

> [t]he record in this case reveals the familiar phenomenon that in metropolitan areas minority groups are often

found concentrated in one part of the city. In some circumstances certain schools may remain all or largely of one race until new schools can be provided or neighborhood patterns change. Schools all or predominantly of one race in a district of mixed population will require close scrutiny to determine that school assignments are not part of state-enforced segregation.

In light of the above, it should be clear that the existence of some small number of one-race, or virtually one-race, schools within a district is not in and of itself the mark of a system that still practices segregation by law. The district judge or school authorities should make every effort to achieve the greatest possible degree of actual desegregation and will thus necessarily be concerned with the elimination of one-race schools. No *per se* rule can adequately embrace all the difficulties of reconciling the competing interests involved; but in a system with a history of segregation the need for remedial criteria of sufficient specificity to assure a school authority's compliance with its constitutional duty warrants a presumption against schools that are substantially disproportionate in their racial composition. Where the school authority's proposed plan for conversion from a dual to a unitary system contemplates the continued existence of some schools that are all or predominantly of one race, they have the burden of showing that such school assignments are genuinely non-discriminatory. The court should scrutinize such

schools, and the burden upon the school authorities will be to satisfy the court that their racial composition is not the result of present or past discriminatory action on their part.

Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 25–26, 91 S.Ct. 1267, 1280, 28 L.Ed.2d 554 (1971).

Several cases dealing with one-race schools have been decided by the Court of Appeals for this circuit since this Court last fully considered compliance in this school system. While neither the Court of Appeals nor the Supreme Court has adopted any explicit, clear test by which to measure the constitutional validity of one-race schools, the Court of Appeals has, since this Court's last major order in this case, reversed district courts in school cases and held that nine all-black schools in one system could not remain in existence,[28] that insufficient pairing had been ordered when schools which could be paired were about one and one-half miles away,[29] and that 14 all-black elementary schools in one system had to be paired or rezoned.[30] Other district courts were reversed because under court-approved plans 80 percent of the blacks attended schools where their race predominates,[31] because 70 percent of all black elementary students attended one all-black school,[32] because 68 percent of the black elementary school students in a system attended schools 90 percent or more black,[33] and because 44 percent of the black students in one system attended all-black or virtually all-black schools.[34] These cases, and others like them decided since this Court's last consideration of this case,

28. Bradley v. Bd. of Public Instruction, 431 F.2d 1377, 1380–1381 (5th Cir. 1970).

29. Weaver v. Bd. of Public Instruction, 467 F.2d 473, 474 (5th Cir. 1972) (all-black school 1.2 to 5.6 miles from predominantly white elementary schools) ; Wright v. Bd. of Public Instruction, 431 F.2d 1200, 1201–1202 (5th Cir. 1970).

30. Mannings v. Bd. of Public Instruction, 427 F.2d 874, 877 (5th Cir. 1970).

31. United States v. Texas Education Agency, 467 F.2d 848, 872–873 (5th Cir. 1972) (en banc).

32. Boykins v. Fairfield Bd. of Educ., 457 F. 2d 1091, 1093 (5th Cir. 1972).

33. Allen v. Bd. of Public Instruction, 432 F. 2d 362, 366 (5th Cir. 1970).

34. Pate v. Dade County, 434 F.2d 1151, 1153 (5th Cir. 1970).

necessitate a re-examination of this case in the light of the state of the law and the facts as they exist in the Montgomery school system today.

## IV. PLAN APPROVED

■ As is already evident from what has been stated in this opinion, this Court proposes to order implemented *in toto* the desegregation plan as proposed by the Montgomery County Board of Education on January 15, revised March 29, 1974, and modified May 8, 1974. The evidence in this case reflects that the plans proposed by the plaintiffs and by the plaintiff-intervenors will accomplish very little stable, long-term desegregation in this school system. This Court desires to emphasize that the remaining predominantly black schools in this school system under the board's plan cannot be effectively desegregated in a practical and workable manner. In each instance this Court has examined and re-examined the evidence and has determined that these predominantly black schools exist and continue to exist without any discriminatory board action. The board's proposal and this Court, in adopting same, have taken "into account the practicalities of the situation" that exist in this school system. Davis v. Board of School Commissioners, 402 U. S. 33, 37, 91 S.Ct. 1289, 28 L.Ed.2d 577. The schools that will remain predominantly black in the Montgomery school system are the result of the concentrations of blacks in the western area of Montgomery. As the Supreme Court observed in Swann v. Charlotte-Mecklenburg, *supra*, the existence of a small number of predominantly black schools in such areas is not in and of itself a sign that a dual school system exists. The school authorities in the Montgomery school system have taken affirmative action to the extent required by the law and have achieved the greatest possible degree of actual desegregation, taking into account the "practicalities of the situation." As this Court has observed time and time again in school desegregation cases, racial quotas and busing to achieve racial quotas are not required by the law.

### A. Elementary Schools

The board has proposed, and this Court is adopting for elementary schools, what is in large measure a "neighborhood" or proximity plan, under which an elementary child normally attends the school nearest his home.

The Court is aware that any "neighborhood school" plan is *strictissimi juris* in this circuit and is to be adopted, if at all, only in narrowly confined instances. This is such a case.

In a *pure* neighborhood school system, as approved in Ellis v. Bd. of Public Instruction, 423 F.2d 203 (5th Cir. 1970), there are two requirements: (1) a strict proximity rule must be followed, under which neither man-made nor natural boundaries may be considered, but only travel distance; [35] and (2) the plan must be one which is effective to establish a unitary school system.

The second criterion, that the plan must effectively provide for a unitary system, was outlined in a footnote:

[u]nder the facts of this case, *it happens that* the school board's choice of a neighborhood assignment system is adequate to convert the Orange Coun-

---

35. "We also hold that the neighborhood system, based on school capacity, must be observed without exception. This will prevent any variance based on traffic conditions . . . . Variances by arbitrary zone lines, or for reasons of traffic, while reasonable on their face, may destroy the integrity and stability of the entire assignment plan. If Orange County wishes to maintain a neighborhood assignment system, then it must do so without variances. Each student in the system must be assigned to attend the school nearest his or her home, limited only by the capacity of the school, and then to the next nearest school."
423 F.2d at 207–208.

ty school system from a dual to a unitary system.

423 F.2d at 208, n. 7 (emphasis added).

However, in a series of cases the Court of Appeals has held that an *Ellis* neighborhood school plan, to be upheld, must provide for the ultimate conversion of a dual to a unitary school system.

In Andrews v. City of Monroe, 425 F. 2d 1017 (5th Cir. 1970), the Court of Appeals held that in Monroe, Louisiana, a city with only 18 schools, an *Ellis* plan was constitutionally infirm if it left 85 percent of the black elementary students in all-black schools, or schools nearly so. 425 F.2d at 1019–1020.

In Henry v. Clarksdale Municipal Separate School District, 433 F.2d 387 (5th Cir. 1970), involving a small city with only seven elementary schools, the Court of Appeals reversed a plan which left three all-white elementary schools and four all-black. The Court of Appeals wrote that the order of the district judge "totally ignores the real key to *Ellis,* the strong caveat of footnote 7 . . . .", 433 F.2d at 390. Footnote 7 was the footnote in *Ellis* which noted that "it happens that . . . [the plan] is adequate to convert the . . . system from a dual to a unitary system." 423 F.2d at 208, n. 7.

Similarly, in Ross v. Eckels, 434 F.2d 1140 (5th Cir. 1970) (Houston, Texas, system), the Court of Appeals reversed a district judge's adoption of an· *Ellis* plan where 29 percent of black students were in all-black or virtually all-black schools, 434 F.2d at 1146, n. 9, noting that each case had to be judged on its own facts. *Id.* at 1147.

In 1970 the Court of Appeals reversed a district court's adoption of an *Ellis* plan in Alexandria, Louisiana, where 60 percent of the black students were in schools where their race constituted 90 percent or more of the student body. The Court of Appeals held that

[t]he end result is that neighborhood zoning in Alexandria, Louisiana,

leaves the majority of the city's Negro students in a virtually segregated school system. The fact that the plan complies with the requirements for a neighborhood system as enunciated by this Court in [*Ellis*] does not make the system constitutionally palatable unless the plan actually works to achieve integration.

Valley v. Rapides Parish School Bd., 434 F.2d 144, 145 (5th Cir. 1970).

In a case from Lake Charles, Louisiana, the Court of Appeals reversed a district judge who had adopted an *Ellis* plan, pointing out that

[a]s to ward 3, the Board plan is not up to constitutional standards. In many circumstances the *Orange County* approach of neighborhood schools is adequate to convert a school system from a dual to a unitary system. But, as *Orange County* itself makes clear, . . . each case turns on all of its own facts, including those peculiar to the particular system . . . .. A plan which leaves two out of three black children in Lake Charles in schools all black or substantially so, . . . cannot be upheld as constitutional.

Conley v. Lake Charles School Board, 434 F.2d 35 (5th Cir. 1970).

However, the Fifth Circuit Court of Appeals has affirmed the use of the *Ellis* plan in some circumstances where the result is a substantially desegregated school system.˙ The Court of Appeals approved the use of an *Ellis* plan for the schools of Fulton County, Georgia (excluding Atlanta). In that case, only 18 percent of the black students attended all-black schools. While several elementary schools were largely black in composition, Judge Wisdom pointed out that "[e]very black student at some point in his school career will be exposed to complete desegregation . . . .." Hightower v. West, 430 F.2d 552, 555 (5th Cir. 1970). There,

[a]s in so many other cases, these majority-black and all-black schools are

the product of residential segregation and, historically, the location of schools to serve a segregated community.

430 F.2d at 555. The Court of Appeals found several deficiencies in the other plans offered at trial, among them that "[t]he pairing proposals . . . would produce longer walking distances and busing for these elementary school children." *Id.*

Similarly, the Court of Appeals approved the use of an *Ellis* plan in the schools of Anniston and Tuscaloosa. Lee v. Macon County Bd. of Educ., 429 F.2d 1218, 1222 (5th Cir. 1970).

The plan proposed by the school board in this case does not precisely fit the *Ellis* mold. The school assignment has not been effected by precise and mathematical distance measuring; some natural and man-made boundaries have been considered in the process of zoning. However, as this Court views *Ellis*, the *Ellis* plan in its purity is ultimately designed for the school system which is approaching unitary status and will be drawing its own lines. In such a situation a strict *Ellis* plan completely eliminates discretion in student assignment, thus eliminating the possibility of discriminatory student assignment.

However, in this case the plan is under careful judicial scrutiny. This Court, long familiar with every aspect of this case, is convinced that where the board plan for *elementary* schools deviates from a strict *Ellis* proximity plan, the deviation is to maximize, rather than to minimize, desegregation; and thus is intended to help meet the constitutional burden which is upon the board.

■ Therefore, while the school board plan does not strictly meet the absolute standard of *Ellis*, any deviation is for a permissible and proper purpose. Thus, this Court considers that the *principle* of *Ellis*—that neighborhood schools may be constitutionally proper—may be adopted by the district court *if* the line construction is under judicial scrutiny *and* the plan adopted effects desegregation of the complete system.

It is, therefore, necessary to consider whether the school board plan in this case for elementary schools is constitutionally proper.

The plan in *Ellis* itself, which the Court of Appeals held to be "adequate to convert the Orange County school system from a dual to a unitary system," 423 F.2d at 208 n. 7, provided for substantially less desegregation at the elementary level than does the school board plan in this case. In *Ellis*, *seventy-four percent* (74%) of black elementary pupils attended elementary schools which were at least *ninety-nine percent* (99%) black.[36]

While the school board's elementary plan here is better than that in *Ellis*, which was affirmed, it is also better than most of the plans which have been modified or reversed by the Court of Appeals for this circuit. For example, the Monroe, Louisiana, plan left 85 percent of the black elementary pupils in all-black schools. 425 F.2d at 1019–1020. The Clarksdale, Mississippi, plan appears to have left the elementary schools completely segregated. 433 F.2d at 390. The Alexandria, Louisiana, plan provided that 60 percent of the black students were in schools which were 90 percent or more black. 434 F.2d at 145.

■ Thus, while the school board's elementary school plan does not completely eliminate all predominantly black schools on the elementary level, the Court is convinced that *considered as a part of a*

---

36. In *Ellis*, the following elementary schools were at least 99 percent black: Callahan (99 percent); Eccleston (100 percent); Holden Street (99.8 percent); Hungerford (100 percent); Maxey (99.7 percent); Orange Center (100 percent); Richmond Heights (100 percent); Washington Shores (100 percent); Webster Avenue (99 percent); and Wheatley (100 percent). A total of 6,376 black students attended those schools, out of a total black elementary school population of 8,628. Thus, 74 percent of all black elementary pupils in Orange County attended schools at least 99 percent black.

*complete system, under the facts of this case,* the school board's elementary plan is constitutionally acceptable. There are several factors which the Court considers in arriving at this conclusion.

First, in this system, as Judge Wisdom has pointed out in another case, "[e]very black student at some point in his school career will be exposed to complete desegregation . . .." *Hightower v. West,* 430 F.2d 552, 555 (5th Cir. 1970). Grades seven–twelve of the Montgomery system, under the board's plan, are to be completely desgregated.[37]

Second, the *system* as a whole will be desegregated. All of the other five indicia of a unitary school system have been completely met in this school system. Six members of the Court of Appeals,[38] concurring specially in an *en banc* case, have recently affirmed the proposition that normally the *system* as a whole is examined for purposes of determining whether the system is unitary; individual schools are not looked to for that purpose. *United States v. Texas Education Agency,* 467 F.2d 848, 888 (5th Cir. 1972) (*en banc*). In Montgomery County, Alabama, there is system-wide desegregation *of all six* facets and indicia of school desegregation.

Third, in the Fulton County, Georgia, case, the Fifth Circuit wrote of "the value of assigning young children to nearby schools . . .." *Hightower v. West,* 430 F.2d 552, 556 (5th Cir. 1970). It cannot be denied that there is value in having elementary children attend schools near their homes. Recognition of this benefit of neighborhood elementary schools does not constitute abandonment of the goal of desegregation as required by the United States Constitution. If a neighborhood elementary

school system can be effected without a sacrifice of constitutional standards, then such a plan should be adopted.

All factors considered, the neighborhood elementary school system proposed by the board is constitutionally adequate to effect desegregation under the facts of this case. This Court is convinced that to adopt the plans proposed by plaintiffs and plaintiff-intervenors would be to adopt a fixed racial quota for student population. The Supreme Court has indicated that not only is the imposition of racial quotas in schools not required, but a court may commit reversible error if it requires a fixed racial ratio in student population. *Swann v. Charlotte-Mecklenburg Bd. of Educ.,* 402 U.S. 1, 24, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).

### B. *Junior High Schools*

■ As observed earlier, under the board's plan the only junior high school facility that will be over 80 percent black will be the McIntyre facility. For the reasons previously noted, it is not feasible to further desegregate the McIntyre School in a stable and workable manner. This school continues to exist as a predominantly black school through no action on the part of the school board. Of the 13 junior high schools to be operated in the Montgomery system, McIntyre is the only one that comes close to being racially identifiable. For instance, Houston Hill (a formerly all-black school) will be 35 percent black, Goodwyn will be 34 percent black, Georgia Washington ( a formerly all-black school) will be 31 percent black, Floyd will be 35 percent black, Cloverdale will be 33 percent black, Carver (a formerly all-black school) will be 39 percent black, Capitol Heights will be 38 percent black,

37. The board's junior high plan would keep only 18 percent of the black junior high school students in schools 80 percent or more black [excluding Montgomery County High School], and no high school student would be in a school more than 43 percent black [excluding Montgomery County High School].

It is conceded by all parties that Montgomery County High School, which is at the opposite end of the county from the city schools, cannot be effectively desegregated because of its isolation.

38. Judges Brown, Wisdom, Gewin, Goldberg, Dyer, and Simpson.

Baldwin (a formerly all-white school) will be 73 percent black, and Bellingrath (a formerly all-white school) will be 62 percent black. This is the maximum under the circumstances that exist in the Montgomery school system that can be required of the board.

### C. *Senior High Schools*

█ The defendant board's plan on the senior high school level, as observed by the United States in its brief, "appears to be fully acceptable." As a matter of fact, there is very little, if any, controversy among the parties as far as the operation of the senior high schools in the Montgomery system is concerned.[39] The board proposes that Carver High be 39 percent black, that Jeff Davis be 38 percent black, that Lanier be 43 percent black and that Lee be 37%. Such a proposal for the senior high schools within the system is entirely acceptable.

In summary, every formerly all-white school in the Montgomery school system will, under the board's plan, be substantially desegregated. Several formerly all-white schools will now be predominantly black. Further, several formerly all-black schools will become predominantly white.

## V. GENERAL CONSIDERATIONS

### A. *Majority-to-Minority Transfer Rule*

█ The previous orders entered by this Court in this case required the desegregation of not only the students but the faculty and staff, transportation, extra-curricular activities, and facilities and also required, among other things, a rule that the board allow any student enrolled in a school where his race is in the majority to transfer to a school where his race will be in a minority. This majority-to-minority transfer rule also requires the board to provide trans-

portation for those electing to transfer pursuant to this rule. This transfer rule is a viable and effective doctrine in the Montgomery school system. Based on a report that was filed with the Court and made a part of the records in this case, in December, 1973, over 600 blacks had elected to transfer under the majority-to-minority transfer rule. The majority-to-minority transfer policy was incorporated in the order made and entered in this case in February, 1970. Upon review of that order, the United States Court of Appeals for the Fifth Circuit in Carr v. Montgomery County Board, etc., 429 F.2d 382, directed that this Court's order be modified "in light of recent opinions of this court." In July, 1970, pursuant to the direction of the Court of Appeals, this Court ordered that the Montgomery County Board of Education shall provide transportation, if desired, for students transferring pursuant to this majority-to-minority transfer policy. The Court also ordered that students so transferring are to be given priority for space in the schools to which they transfer.

A majority-to-minority transfer provision in a school desegregation order is universally recognized by the courts as a useful tool to accomplish desegregation in a dual school system. As a matter of fact, the Supreme Court of the United States in Swann v. Board of Education, *supra*, stated:

> An optional majority-to-minority transfer provision has long been recognized as a useful part of every desegregation plan. Provision for optional transfer of those in the majority racial group of a particular school to other schools where they will be in the minority is an indispensable remedy for those students willing to transfer to other schools in order to lessen the impact on them of the state-imposed stigma of segregation. In order to be effective, such a transfer ar-

---

39. This is with the exception of Montgomery County High which was not proposed to be desegregated by any of the plans submitted by the parties by reason of its location in a remote area of the county.

rangement must grant the transferring student free transportation and space must be made available in the school to which he desires to move. The vital importance of the effective operation of the majority-to-minority transfer has been noted by the Fifth Circuit in several cases.[40] In *Cisneros*, the *en banc* court stated:

> An overall amelioration of any possible discrimination will tend to be accomplished by the use of the mandatory majority to minority transfer provision of *Swann, supra,* 402 U.S. at 36–37, 91 S.Ct. 1267, 28 L.Ed.2d 554, heretofore ordered by the district court. Such a provision will guarantee to both races an unfettered right to attend schools with members of an opposite race or identifiable ethnic group, and with transportation provided.

As stated, the Montgomery school board has and continues to implement a majority-to-minority transfer provision that complies with every requirement of the existing school desegregation laws.

### B. *Biracial Committee*

 Up until this time, the Montgomery school board has not operated with the assistance of a biracial committee. In an order made and entered in this case on March 13, 1974, this Court stated:

> An over-all review of the applicable school desegregation decisions rendered since *Swann, Green,* and *Davis* reflects that this Court is now required to give serious consideration to the appointment of a biracial committee. The biracial committee is to be constituted by this Court from names submitted by the parties to this litigation. The committee is to review the operation of the Montgomery County transportation system and the majority-to-minority transfer rule and is to

be charged with responsibility in the area of selecting school sites. The committee will be authorized to hold hearings and make recommendations to the school board in connection with any of these activities.

\* \* \* \* \* \*

> It is further ordered that within 15 days from this date each party to this litigation submit to this Court the names of 20 citizens residing in Montgomery County, Alabama; one-half of the names submitted will be black citizens and the other half will be white citizens; the submission of these names is to be for the purpose of the Court's constituting from the names submitted a biracial committee for the purposes hereinabove discussed.

The parties have, as directed, submitted the names of citizens to the Court, and the Court has chosen from the names submitted 15 black citizens and 15 white citizens to constitute the Montgomery County school system's biracial committee. A separate order will be made and filed contemporaneously with this order designating the citizens who are to constitute this committee and outlining their functions and responsibilities. The Chairmanship of the committee will be rotated each two years with the committee selecting the chairman to succeed the initial chairman being designated by this Court. The membership of the committee represents a cross-section of the Montgomery, Alabama, area with regard to race, sex, and ethnic and economic backgrounds. The Montgomery County Board of Education will be required to cooperate with the committee or any of its subcommittees, furnishing any information, records or documents requested by said committee.

### C. *Arbitrary Tolerances or Guidelines*

As noted earlier, the plaintiffs' expert witness, Dr. Foster, and the plaintiff-in-

---

40. Cisneros v. Corpus Christi Independent School District, 467 F.2d 142, 153 (5th Cir. 1972) (*en banc*); Ellis v. Bd. of Public Instruction of Orange County, 423 F.2d 203, 206 (5th Cir. 1970); Singleton v. Jackson Municipal Separate School District, 419 F.2d 1211, 1218 (5th Cir. 1970) (*en banc*).

tervenors' expert witness, Dr. Winecoff, instead of evaluating the system as a whole, evaluate each school within the system independently for the purpose of arriving at certain conclusions that some schools within the system continue to be "racially identifiable." In doing this, Dr. Foster uses a 15 percent variation or tolerance and Dr. Winecoff uses a 10 to 15 percent variation or tolerance to determine the racial identifiability of elementary and junior high schools in the Montgomery school system. These variations are determined on the elementary and junior high school level on the basis that 48.5 percent of the total elementary and junior high school students enrolled in the system are black. This means that, pursuant to Dr. Foster's computation (a similar procedure is followed by Dr. Winecoff), any elementary or junior high school with an enrollment less than 33.5 percent black is "racially identifiable" as white. If the enrollment is more than 63.5 percent black, the school, according to Dr. Foster, is "racially identifiable" as black.

The use of such variances or tolerances is highly artificial and cannot be applied in the Montgomery County school system without severely and unnecessarily disrupting the operation of the system and without severely and unnecessarily impinging on the educational processes in the Montgomery school system. The application of such formulas must of necessity proceed on the theory that a racial balance is to be achieved and is required under the law. Furthermore, the formalistic and mechanical application of the 15 percent tolerance of Dr. Foster or the 10 to 15 percent tolerance or deviation of Dr. Winecoff gives no consideration whatsoever to the other indicia in school desegregation cases such as faculty, transportation, facilities and extra-curricular activities. To label schools that do not fall within these tolerances or deviations as "racially identifiable" means that, in order not to be "racially identifiable," each school within any school system must meet certain predetermined ratios. As this Court has stated through the years time and time again, racial balance is not constitutionally required. The Supreme Court of the United States in Swann v. Board of Education, *supra*, emphasized this by stating:

> [i]f we were to read the holding of the District Court to require, as a matter of substantive constitutional right, any particular degree of racial balance or mixing, that approach would be disapproved and we would be obliged to reverse. The constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole.

## VI. CONCLUSION

This Court feels an obligation to point out that its allowance of a neighborhood elementary school system does not constitute an abandonment by this Court of the goal of securing to all citizens their rights guaranteed by the Fourteenth Amendment. This Court has always strived to guarantee to all citizens, both black and white, their right to equal protection of the laws. This Court has never balked at the enforcement of constitutional rights in racial discrimination cases. In the last nineteen years, this Court has sat in cases in which the constitutional rights of black citizens had been denied in that blacks were discriminated against when they sought an equal right to use buses,[41] airports,[42] libraries,[43] parks,[44] and YMCA's.[45] The

41. Lewis v. Greyhound Corp., 199 F.Supp. 210 (M.D.Ala.1961) ; Browder v. Gayle, 142 F.Supp. 707 (M.D.Ala.1956), aff'd, 352 U.S. 903, 77 S.Ct. 145, 1 L.Ed.2d 114 (1957).

42. United States v. City of Montgomery, 201 F.Supp. 590 (M.D.Ala.1962).

43. Cobb v. Montgomery Library Board, 207 F.Supp. 880 (M.D.Ala.1962).

44. Gilmore v. City of Montgomery, 176 F. Supp. 776 (M.D.Ala.1959).

45. Smith v. YMCA, 316 F.Supp. 899 (M.D. Ala.1970), aff'd 462 F.2d 634 (5th Cir. 1972).

Court has further dealt with racial discrimination in the areas of voting rights,[46] jury selection,[47] and governmental hiring by both state[48] and federal[49] governments, and has also dealt with governmental districting.[50] In the school field, this Court has decided cases which involved aid to private schools,[51] school desegregation on the level of local schools,[52] statewide administration,[53] athletic programs,[54] faculty,[55] graduate schools,[56] and trade schools and junior colleges.[57] This Court stands on its record showing its willingness to protect, where necessary, the constitutional rights of black citizens against racial discrimination by government officials. This Court has not in the past allowed, and is not now allowing, the violation of constitutional rights to go unremedied. In adopting the school board's plan providing for elementary schools under a "neighborhood" system, this Court in all respects is following the mandate of the Fourteenth Amendment and has arrived at the conclusions stated herein upon an evaluation of the Montgomery school system *as a whole.*

46. State of Alabama v. Rogers, 187 F.Supp. 848 (M.D.Ala.1960), aff'd 285 F.2d 430 (5th Cir. 1961) ; United States v. State of Alabama, 252 F.Supp. 95 (M.D.Ala.1965) ; United States v. Parker, 236 F.Supp. 511 (M.D.Ala.1964) ; United States v. Cartwright, 230 F.Supp. 873 (M.D.Ala.1964) ; United States v. Penton, 212 F.Supp. 193 (M.D.Ala.1962) ; United States v. State of Alabama, 192 F.Supp. 677 (M.D.Ala.1961).

47. Penn v. Eubanks, 360 F.Supp. 699 (M.D. Ala.1973) ; White v. Crook, 251 F.Supp. 401 (M.D.Ala.1966).

48. NAACP v. Allen, 340 F.Supp. 703 (M.D. Ala.1972), aff'd, 493 F.2d 614 (5th Cir. 1974) ; Strain v. Philpott, 331 F.Supp. 836 (M.D.Ala.1971) ; United States v. Frazer, 317 F.Supp. 1079 (M.D.Ala.1970) ; 297 F. Supp. 319 (M.D.Ala.1968).

49. Penn v. Schlesinger, 350 F.Supp. 752 (M. D.Ala.1973), aff'd, 490 F.2d 700 (5th Cir. 1973), rehearing en banc granted (5th Cir. 1974).

50. Yelverton v. Driggers, 370 F.Supp. 612 (M.D.Ala.1974).

51. Gilmore v. City of Montgomery, 337 F. Supp. 22 (M.D.Ala.1972), modified and aff'd, 473 F.2d 832 (5th Cir. 1972), cert. granted, 414 U.S. 907, 94 S.Ct. 215, 38 L.Ed.2d 145 (1973) ; Crenshaw County Private School Foundation v. Connally, 343 F.Supp. 495

(M.D.Ala.1972), aff'd, 474 F.2d 1185 (5th Cir. 1973) ; Lee v. Macon County Bd. of Educ., 267 F.Supp. 458 (M.D.Ala.1967) ; 231 F.Supp. 743 (M.D.Ala.1964).

52. Lee v. Macon County Bd. of Educ., 292 F.Supp. 363 (M.D.Ala.1968) ; 289 F.Supp. 975 (M.D.Ala.1968) ; 270 F.Supp. 859 (M. D.Ala.1967) ; 231 F.Supp. 743 (M.D.Ala. 1964) ; Harris v. Crenshaw County Bd. of Educ., 259 F.Supp. 167 (M.D.Ala.1966) ; Franklin v. Barbour County Bd. of Educ., 259 F.Supp. 545 (M.D.Ala.1966) ; Harris v. Bullock County Bd. of Educ., 253 F.Supp. 276 (M.D.Ala.1966) ; Carr v. Montgomery County Bd. of Educ., 253 F.Supp. 306 (M. D.Ala.1966).

53. Lee v. Macon County Bd. of Educ., 267 F.Supp. 458 (M.D.Ala.1967).

54. Lee v. Macon County Bd. of Educ., 283 F.Supp. 194 (M.D.Ala.1968).

55. Carr v. Montgomery County Bd. of Educ., 289 F.Supp. 647 (M.D.Ala.), aff'd as modified, 400 F.2d 1 (5th Cir. 1968), aff'd 395 U.S. 225, 89 S.Ct. 1670, 23 L.Ed.2d 263 (1969).

56. Parker v. Franklin, 223 F.Supp. 724 (M. D.Ala.), aff'd as modified, 331 F.2d 841 (5th Cir. 1964).

57. Lee v. Macon County Bd. of Educ., 317 F.Supp. 103 (M.D.Ala.1970), aff'd 453 F.2d 524 (5th Cir. 1971).

## TABLE 1

FACULTY DESEGREGATION

| | Name of School | September 1973 | | 1974–75 Projections | |
|---|---|---|---|---|---|
| | | Black | White | Black | White |
| 1 | Baldwin | 18 | 22 | 8 | 12 |
| 2 | Bear | 8 | 13 | 9 | 14 |
| 3 | Bellinger Hill | 4 | 4 | 4 | 7 |
| 4 | Bellingrath | 17 | 28 | 18 | 25 |
| 5 | Booker T. Washington (Elementary) | 6 | 7 | 6 | 6 |
| 6 | Booker T. Washington (Jr. High) | 5 | 6 | To be | closed |
| 7 | Capitol Heights (Elementary) | 10 | 15 | 6 | 7 |
| 8 | Capitol Heights (Jr. High) | 17 | 25 | 15 | 22 |
| 9 | Carver (Elementary) | 15 | 19 | 7 | 10 |
| 10 | Carver (Jr. High) | 8 | 12 | 13 | 19 |
| 11 | Carver (Sr. High) | 21 | 25 | 19 | 28 |
| 12 | Catoma | 3 | 6 | 4 | 4 |
| 13 | Chilton | 4 | 4 | To be | closed |
| 14 | Chisholm | 13 | 21 | 14 | 20 |
| 15 | Cloverdale | 19 | 27 | 18 | 24 |
| 16 | Crump | 11 | 16 | 13 | 19 |
| 17 | Daisy Lawrence | 9 | 13 | 8 | 11 |
| 18 | Dalraida | 11 | 13 | 9 | 11 |
| 19 | Dannelly | 14 | 19 | 10 | 13 |
| 20 | Davis | 11 | 17 | 11 | 17 |
| 21 | Dunbar | 7 | 11 | 8 | 9 |
| 22 | Fews | 9 | 10 | 10 | 16 |
| 23 | Flowers | 12 | 17 | 11 | 15 |
| 24 | Floyd | 17 | 28 | 19 | 29 |
| 25 | Forest Avenue | 7 | 11 | 7 | 10 |
| 26 | Georgia Washington | 8 | 13 | 16 | 25 |
| 27 | Goode Street | 6 | 7 | 3 | 5 |
| 28 | Goodwyn | 22 | 32 | 22 | 28 |
| 29 | Harrison | 12 | 16 | 12 | 14 |
| 30 | Hayneville Road | 18 | 23 | 15 | 23 |
| 31 | Head | 9 | 13 | 8 | 11 |
| 32 | Highland Avenue | 7 | 10 | 7 | 9 |
| 33 | Highland Gardens | 15 | 20 | 15 | 20 |
| 34 | Houston Hill | 8 | 10 | 8 | 11 |
| 35 | Jefferson Davis | 32 | 61 | 36 | 59 |
| 36 | Johnson | 10 | 13 | 10 | 13 |
| 37 | Lanier | 37 | 63 | 30 | 49 |
| 38 | Lee | 35 | 64 | 40 | 65 |
| 39 | Loveless | 13 | 14 | 16 | 23 |
| 40 | McIntyre | 17 | 25 | 12 | 19 |
| 41 | MacMillan | 7 | 7 | 6 | 7 |
| 42 | Madison Park | 3 | 5 | To be | closed |
| 43 | Montgomery Area Voc. Center | 5 | 14 | 8 | 11 |
| 44 | Montgomery County High | 9 | 15 | 9 | 12 |
| 45 | Morningview | 10 | 13 | 9 | 13 |
| 46 | Paterson | 13 | 14 | 11 | 14 |
| 47 | Peterson | 9 | 11 | 8 | 11 |
| 48 | Pintlala | 4 | 6 | 4 | 6 |
| 49 | Southlawn | 10 | 14 | 9 | 13 |
| 50 | Union St. Area Voc. Center | 10 | 13 | 14 | 17 |
| 51 | Eastern Bypass (Elementary) | — | — | 10 | 16 |
| 52 | Vaughan Road (Elementary) | — | — | 9 | 12 |

## TABLE 2

ELEMENTARY

| | Actual Enrollment, March, 1974 | | | | Projected Under Board Plan | | | |
| SCHOOL | Black | White | Total | % Black | Black | White | Total | % Black |
|---|---|---|---|---|---|---|---|---|
| BEAR | 75 | 503 | 578 | 12.9% | 186 | 505 | 691 | 27% |
| BELLINGER HILL ELEM. | 108 | 42 | 150 | 72 | 186 | 43 | 229 | 81 |
| BELLINGRATH ELEM. | 116 | 83 | 199 | 58.3 | 115 | 100 | 215 | 53 |
| BOOK. WASH. ELEM. | 253 | 4 | 257 | 98 | 255 | 4 | 259 | 98 |
| CAPT. HGTS. ELEM. | 120 | 463 | 583 | 20.5 | 119 | 192 | 311 | 38 |
| CARVER ELEM. | 846 | 2 | 848 | 99 | 421 | 2 | 423 | 99 |
| CATOMA ELEM. | 70 | 163 | 233 | 30 | 63 | 154 | 217 | 29 |
| CHILTON ELEM. | 127 | 13 | 140 | 90 | Closed-assigned to Dalraida and Head | | | |
| CHISHOLM ELEM. | 338 | 565 | 903 | 37 | 326 | 555 | 881 | 37 |
| CRUMP ELEM. | 89 | 690 | 779 | 11 | 263 | 703 | 966 | 27 |
| DAISY LAWRENCE ELEM. | 449 | 7 | 456 | 98 | 445 | 7 | 452 | 98 |
| DALRAIDA ELEM. | 69 | 577 | 646 | 10.6 | 153 | 428 | 581 | 26 |
| DANNELLY ELEM. | 96 | 915 | 1,011 | 9.5 | 236 | 484 | 720 | 32 |
| DAVIS ELEM. | 627 | 89 | 716 | 87 | 615 | 91 | 706 | 87 |
| DUNBAR ELEM. | 339 | 50 | 389 | 87 | 340 | 51 | 391 | 87 |
| FEWS ELEM. | 443 | 2 | 445 | 99 | 640 | 3 | 643 | 99 |
| FLOWERS ELEM. | 126 | 628 | 754 | 16.7 | 169 | 573 | 742 | 23 |
| FLOYD ELEM. | 191 | 312 | 503 | 37.9 | 148 | 319 | 467 | 32 |
| FOREST AVENUE ELEM. | 176 | 269 | 445 | 39.5 | 172 | 262 | 434 | 40 |
| GEORGIA WASH. ELEM. | 323 | 3 | 326 | 99 | Consol. with new schools | | | |
| GOODE ST. ELEM. | 279 | 1 | 280 | 99 | Converted to center for handicapped | | | |
| HARRISON ELEM. | 298 | 433 | 731 | 40 | 184 | 427 | 611 | 30 |
| HAYNV. RD. ELEM. | 679 | 29 | 708 | 96 | 669 | 30 | 699 | 95 |
| HEAD ELEM. | 68 | 531 | 599 | 11.3 | 148 | 415 | 563 | 26 |
| HIGHLAND AV. ELEM. | 118 | 271 | 389 | 30.3 | 115 | 272 | 387 | 30 |
| HIGHLAND GARDENS EL. | 334 | 555 | 889 | 37.5 | 335 | 551 | 886 | 38 |
| JOHNSON ELEM. | 48 | 557 | 605 | 7.9 | 175 | 550 | 725 | 24 |
| LOVELESS ELEM. | 289 | 0 | 289 | 100 | 902 | 5 | 907 | 99 |
| McINTYRE ELEM. | 615 | 5 | 620 | 99.2 | Consol. with Loveless | | | |
| MacMILLAN ELEM. | 204 | 105 | 309 | 66 | 205 | 109 | 314 | 65 |
| MADISON PARK ELEM. | 142 | 0 | 142 | 100 | Closed-assigned to Eastern By-pass | | | |
| MORNINGVIEW ELEM. | 131 | 467 | 598 | 22 | 134 | 486 | 620 | 22 |
| PATERSON ELEM. | 557 | 32 | 589 | 94 | 566 | 34 | 600 | 94 |
| PETERSON ELEM. | 174 | 299 | 473 | 36.7 | 175 | 299 | 474 | 37 |
| PINTLALA ELEM. | 205 | 14 | 219 | 93 | 204 | 16 | 220 | 93 |
| SOUTHLAWN ELEM. | 157 | 491 | 648 | 24 | 223 | 492 | 715 | 31 |
| EASTERN BY-PASS EL. | | | | | 149 | 589 | 738 | 20 |
| VAUGHAN RD. ELEM. | | | | | 188 | 409 | 597 | 32 |
| TOTALS | 9,279 | 9,170 | 18,449 | | 9,224 | 9,160 | 18,384 | |

JUNIOR HIGH

| | Black | White | Total | % Black | Black | White | Total | % Black |
|---|---|---|---|---|---|---|---|---|
| BALDWIN JR. | 558 | 635 | 1,193 | 46.7 | 290 | 107 | 397 | 73 |
| BELLINGRATH JR. | 680 | 373 | 1,053 | 64 | 659 | 390 | 1,049 | 62 |
| BOOK. WASH. JR. | 221 | 0 | 221 | 100 | Consol. with Capt. Hgts., Clov., and Houston Hill | | | |
| CAPT. HGTS. JR. | 313 | 889 | 1,202 | 26 | 442 | 730 | 1,172 | 38 |
| CARVER JR. | 534 | 0 | 534 | 100 | 350 | 545 | 895 | 39 |
| CLOVERDALE JR. | 156 | 1,351 | 1,507 | 10.3 | 437 | 875 | 1,312 | 33 |
| FLOYD JR. | 159 | 575 | 734 | 21.6 | 288 | 541 | 829 | 35 |
| HAYNV. RD. JR. | 280 | 17 | 297 | 94.2 | Consol. with Floyd and Goodwyn | | | |
| G. WASHINGTON JR. | 160 | 0 | 160 | 100 | 357 | 782 | 1,139 | 31 |
| GOODWYN JR. | 259 | 1,339 | 1,598 | 16 | 540 | 1,031 | 1,571 | 34 |
| HOUSTON HILL JR. | 326 | 57 | 383 | 85 | 210 | 383 | 593 | 35 |
| LOVELESS JR. | 353 | 0 | 353 | 100 | Consol. with McIntyre | | | |
| McINTYRE JR. | 391 | 18 | 409 | 96 | 792 | 14 | 806 | 98 |
| TOTALS | 4,390 | 5,254 | 9,644 | | 4,365 | 5,398 | 9,763 | |

SENIOR HIGH

| | Black | White | Total | % Black | Black | White | Total | % Black |
|---|---|---|---|---|---|---|---|---|
| CARVER SR. | 958 | 6 | 964 | 99 | 439 | 660 | 1,099 | 39 |
| JEFF. DAVIS SR. | 412 | 1,668 | 2,080 | 19.8 | 868 | 1,426 | 2,294 | 38 |
| LANIER SR. | 951 | 1,288 | 2,239 | 42.5 | 817 | 1,068 | 1,885 | 43 |
| LEE SR. | 661 | 1,527 | 2,188 | 30.2 | 929 | 1,560 | 2,489 | 37 |
| MTGY. CO. HIGH SR. | 391 | 61 | 452 | 86.5 | 399 | 63 | 462 | 86 |
| TOTALS | 3,373 | 4,550 | 7,923 | | 3,452 | 4,777 | 8,229 | |